STATE OF NORTH CAROLINA v. GEORGE THOMAS WILKERSON

No. 170A07

(Filed 28 August 2009)

## 1. Constitutional Law— substantive due process—alleged false testimony by State's witness—consideration or sentence reduction for testimony

The trial court did not violate defendant's Fourteenth Amendment right to substantive due process in a double first-degree murder case by failing to correct alleged false testimony given by a State's witness when she stated that she had not been promised any additional consideration or sentence reduction from the prosecutor in exchange for her testimony against defendant because: (1) the witness accurately testified that she had no assurance of an additional reduction in her sentence when the prosecutor's agreement to inform federal authorities of the witness's truthful testimony did not, and could not, guarantee that her sentence would be reduced, nor could the communication of the information to the federal prosecutor directly result in the filing of a motion to reduce her sentence; and (2) to the extent that her testimony may have led jurors mistakenly to believe that she could not receive a benefit from her testimony against defendant, any misunderstanding was corrected by her subsequent admission during cross-examination that she hoped her sentence would be further reduced.

## 2. Constitutional Law— effective assistance of counsel—failure to object

Defendant was not denied effective assistance of counsel in a double first-degree murder case based on defense counsel's failure to object to or correct a State witness's alleged false testimony and later by affirmatively stating during closing argument that the prosecutor had not entered into a deal with the witness because: (1) the record indicated that defense counsel extensively cross-examined the witness about her federal charges and the benefits she had received in federal court for her cooperation; and (2) there was no quid pro quo between the State and the witness, and any ambiguity created by the witness's direct testimony was corrected on cross-examination.

**3. Evidence— detective—opinion testimony—whether evidence implicated another perpetrator**

The trial court did not commit plain error in a double first-degree murder case by permitting a detective to give alleged improper opinion testimony as to whether any evidence implicated another individual in the murders because: (1) the detective's testimony that she had no evidence implicating the individual was not necessarily an opinion when the statement described the results of her investigation and her interpretation of those results; (2) the detective's exclusion of the pertinent individual did not ipso facto implicate defendant when, as here, multiple perpetrators acted in concert and one suspect's involvement does not necessarily vitiate the culpability of another; and (3) assuming *arguendo* that the detective's testimony was an otherwise inadmissible opinion, it was properly admitted under the circumstances in this case to explain or rebut evidence elicited by the defendant which, if unexplained, was likely to mislead the jury.

**4. Evidence— opinion testimony—personal knowledge—reason for actions**

The trial court did not err in a double first-degree murder case by overruling defendant's objection when defendant's girlfriend testified that the reason she removed contraband from her apartment the morning after the murders was because she believed defendant had killed someone, even though defendant contends it was impermissible opinion testimony, because: (1) this information explaining why the witness acted as she did was within the witness's personal knowledge and was admissible to clarify evidence elicited by defense counsel on cross-examination; and (2) the witness's explanation of her motivation was not an opinion as to defendant's guilt.

**5. Evidence— cross-examination—defendant was ringleader—plain error analysis**

The trial court did not commit plain error in a double first-degree murder case by permitting an eyewitness to testify during cross-examination that he knew in his heart who shot the two victims and that defendant was the ringleader, even though defense counsel attempted to establish the eyewitness did not know defendant was at the mobile home since he did not actually see the faces of the two men who committed the murders, because: (1) even though the transcript demonstrated the witness was hos-

tile toward defendant and resisted defense counsel's attempts to control cross-examination, defense counsel effectively established that the witness was unable to see the face of either assailant and impeached the witness by confronting him with a prior inconsistent statement to police in which the witness failed to name defendant as a possible perpetrator of the crimes, thus, diminishing the force of the witness's nonresponsive statements; and (2) the trial court's failure to strike this evidence *ex mero motu* was not plain error in light of the other evidence of guilt presented by the State.

**6. Constitutional Law— effective assistance of counsel—failure to move to strike testimony—failure to show prejudice**

Defendant was not denied effective assistance of counsel in a double first-degree murder case based on defense counsel's failure to move to strike an eyewitness's volunteered statements that he knew in his heart who shot the two victims and that defendant was the ringleader because: (1) defense counsel elicited the witness's concession that he did not see the face of either perpetrator and also impeached the witness with a prior inconsistent statement to investigators in which the witness did not identify defendant as a participant, thus significantly undercutting the impact of the witness's opinion as to the assailant's identity; (2) other evidence established that defendant armed himself, went to one victim's home to avenge a perceived wrong, and later told his girlfriend that "it was easy. . . . just like in a damn movie"; and (3) it cannot be said that the eyewitness's alleged inadmissible testimony probably resulted in the jury returning a different verdict than it would have reached had the evidence not been admitted.

**7. Evidence— testimony—defendant purchased drugs and guns on day of murders**

The trial court did not err in a double first-degree murder case by permitting a witness to testify that defendant purchased drugs and guns from her husband on the day of the murders because: (1) although the evidence supporting the witness's assumption that her husband sold drugs to defendant was not based upon personal knowledge or perception and her inference that a drug deal occurred was a supposition based largely on guesswork and speculation, in light of the other evidence against defendant and the relative insignificance of this evidence of one purported drug sale, the error was not prejudicial; (2) in regard to the witness's testimony that her husband sold one or more

firearms to defendant, although she did not witness a complete transaction in that she did not see money change hands, N.C.G.S. § 8C-1, Rule 701 permits a lay witness to testify to an inference that is rationally based on the perception of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue, and her natural inference that a sale took place was supported by her perceptions; (3) even if the witness's testimony that her husband sold the weapons to defendant was improper, any error in its admission was not prejudicial since the gravamen of her testimony was that defendant obtained from her husband weapons with which to kill "some people" who had stolen from him, and whether defendant obtained the weapons through a sale was immaterial; and (4) there was no reasonable possibility that had the error in question not been committed, a different result would have been reached at trial.

## 8. Evidence— hearsay—excited utterance exception—defendant threatened to kill victim

The trial court did not err in a double first-degree murder case by permitting a victim's brother to testify over defendant's objection, under the excited utterance exception to the hearsay rule, that the victim told him defendant had threatened them both in a telephone call because: (1) the brother's testimony established that receiving the call surprised the victim, who became visibly upset during the call and immediately afterwards related to his brother that defendant had made the call and had threatened to kill the victim; and (2) the victim believed defendant wrongfully accused him of stealing cocaine and was disturbed enough to telephone a friend and ask for transportation, and the victim's statements represented a spontaneous reaction to an event that was sufficiently startling to suspend his reflective thoughts.

## 9. Evidence— 911 call—plain error analysis

The trial court did not err or commit plain error in a double first-degree murder case by admitting the entire tape recording of the call to 911 by the victim's brother just before the shooting requesting police officers to come to his house, including the statement that "more than likely they'll rob us," because: (1) the statement was relevant to explain to the dispatcher why the brother felt threatened by defendant and why he called 911; (2) the brother related in the 911 call the threatening defendant caller's own statement concerning his motive, and in context,

STATE v. WILKERSON

[363 N.C. 382 (2009)]

the statement may be understood as a threat to take thirty dollars from the brother and the victim at gunpoint or, in other words, as a threat to commit armed robbery; (3) the brother's comment that it was more than likely they were going to commit a robbery merely clarified and restated this evidence, to which defendant did not object; and (4) the probative value of the disputed evidence was not substantially outweighed by the danger of unfair prejudice.

**10. Evidence— hearsay—cell phone number—failure to show prejudice**

The trial court did not err in a double first-degree murder case by admitting the police report created at the time of the arrest of the man who sold defendant weapons, for the purpose of establishing the man's cellular telephone number which was provided by the man upon his arrest and was the same number defendant dialed while hiding under the tractor-trailer on Highway 220 immediately after the pertinent shooting, because: (1) defendant conceded that the primary document, the arrest report, was an admissible business record; (2) although the telephone number contained in the report memorialized an assertion made by the man at the time of his arrest and was therefore hearsay, in light of the entire case presented by the State, defendant has not established that there was a reasonable possibility that had the error in question not been committed, a different result would have been reached by the jury given other substantial evidence presented by the State that established defendant's intent to shoot the victim, his purchase and possession of the murder weapons, his presence in the mobile home at the time of the shooting, his attempt to cover up his actions, and his inculpatory statements made while awaiting trial; (3) the State offered other evidence from which jurors could conclude defendant called the man after the murders; and (4) although defendant argued that admission of this hearsay violated his Sixth Amendment right to confront the man, defendant waived this argument by failing to object on this basis at trial.

**11. Evidence— testimony—victim's reputation for peacefulness—harmless error**

The trial court committed harmless error in a double first-degree murder case by admitting over defendant's objection a witness's testimony as to the reputation of one of the victims for peacefulness because: (1) defendant acknowledged in his brief

that all admissible evidence indicated the victim did not provoke the attack, and, in fact, no evidence indicated that any aspect of the victim's character played any role in the pertinent events; (2) any prejudicial effect arising from the admission of this inadmissible character evidence was de minimis when there was no reasonable possibility that a different result would have been reached at trial had the disputed testimony been excluded; and (3) after reviewing the witness's testimony in context and considering the entirety of the State's evidence, this disputed testimony did not encourage jurors to convict defendant out of sympathy for the victim.

**12. Criminal Law— prosecutor's argument—reasonable inference drawn from evidence—acting in concert**

The trial court did not err in a double first-degree murder case by failing to intervene *ex mero motu* during the prosecutor's closing arguments, including when the prosecutor told the jury the reason a man advised defendant's girlfriend that defendant and a coparticipant had shot someone was that defendant had given the man this information in a telephone call following the shootings, when the prosecutor said that the man knew to clean out the girlfriend's apartment because of defendant's supposed call to the man, and also when the prosecutor told jurors that the coparticipant would also be tried for involvement in the killings while discussing the theory of acting in concert, because: (1) the prosecutor's argument that the man knew about the murders because defendant told him about them is a reasonable inference that can be drawn from evidence introduced through telephone records and the testimony of a detective indicating that defendant's cellular telephone was used to make several calls to the man's cellular telephone around the time the murders were committed, and the prosecutor's argument that the man thus knew to advise the girlfriend to clean out her apartment may be inferred from the same evidence; and (2) the prosecutor's argument that defendant and a coparticipant would be equally guilty was an accurate statement of law applicable to the State's theory of the case, which was that defendant and the coparticipant acted in concert to commit the murders.

**13. Criminal Law— prosecutor's argument—personal belief— credibility**

The trial court did not err in a double first-degree murder case by failing to intervene *ex mero motu* when the prosecutor

allegedly expressed personal opinions during closing arguments in the guilt-innocence phase of defendant's trial by vouching for the credibility of two witnesses, or by arguing his personal belief in defendant's guilt under the theory of acting in concert, because: (1) as to the first witness, the prosecutor did not personally vouch for her veracity but instead provided jurors reason to believe the witness by arguing that her testimony was truthful because it was corroborated; (2) as to defendant's girlfriend, the prosecutor pointed out that her testimony was consistent with the evidence; the prosecutor conceded weaknesses by acknowledging that the girlfriend was not a likeable person and that some of the girlfriend's statements such as her statements about another man's footwear, did not fit the State's theory of the case; and while the prosecutor's passing comment that he believed the girlfriend was telling the truth violated section 15A-1230(a), the comment was made while admitting weaknesses in her testimony; and (3) as to the prosecutor's argument that defendant and a coparticipant were equally culpable for the murders of the two victims, our Supreme Court already concluded that the prosecutor correctly explained the legal theory of acting in concert.

**14. Criminal Law— motion for new trial—cumulative effect of errors**

Although defendant contends the cumulative effect of the errors in a double first-degree murder case were sufficiently prejudicial to require a new trial, including the admission of hearsay in the form of a man's cell phone number, the admission of a witness's opinion testimony concerning a victim's reputation for peacefulness, the admission of a witness's assumption that her husband sold drugs to defendant in their back bedroom, and the prosecutor's personal vouching for a witness's veracity, a review of the record revealed that after comparing the overwhelming evidence of defendant's guilt with the evidence improperly admitted, taken together, these errors did not deprive defendant of his due process right to a fair trial.

**15. Burglary and Unlawful Breaking or Entering; Homicide— first-degree burglary—felony murder—motion to dismiss— sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charges of felony murder and first-degree burglary, even though defendant contends that the State failed to present sufficient evidence that he possessed the felonious intent that is

an essential element of first-degree burglary when he broke and entered into the pertinent residence, because: (1) the State's evidence showed that defendant threatened to kill a victim over thirty dollars worth of cocaine that defendant believed the victim had stolen; defendant acknowledged to a detective that he was inside the mobile home at the time of the murders and that he searched the victims' pockets; investigators found the victim's wallet next to his body on the couch and a twenty dollar bill on the gravel driveway outside the home; and although a detective did not mention the twenty dollar bill to defendant, during a statement to a detective made two days later, defendant volunteered that the money was not his, explaining that a coparticipant probably dropped the bill when running from the home; and (2) although defendant interpreted other evidence introduced in this case to support his arguments either that the murders were committed solely for the purpose of preserving the perpetrators' reputations as drug dealers or that the perpetrators had abandoned their intent to rob the victim by the time they broke into the mobile home, any contradictions or conflicts in the evidence are resolved in favor of the State when ruling on a motion to dismiss, and evidence unfavorable to the State is not considered.

**16. Confessions and Incriminating Statements— *Miranda* warnings—motion to suppress—post-arrest statements— knowing and voluntary waiver**

The trial court did not commit prejudicial error when it denied defendant's motion to suppress his post-arrest statements to investigators even though defendant was only given the Miranda warnings prior to his first interview by officers but was not re-Mirandized prior to other inverviews conducted by officers over a four-hour period, or when it found that defendant knowingly and voluntarily waived his rights under *Miranda*, because: (1) the trial court found that no evidence in the record indicated that defendant stated that he was under the influence of an impairing substance while being questioned; (2) there was no evidence in the record that defendant ever requested to terminate the interview, nor did defendant request counsel at any time during any of the interviews; (3) although defendant occasionally trailed off in the middle of his sentences, he did not exhibit any confusion or slur his words during the interviews; (4) the trial court's finding of fact was largely based on the interviewing detectives' testimony that defendant appeared to be

impaired but was able to respond to questioning coherently and logically, and this testimony, combined with other similar evidence, fully supported the trial court's finding of fact that defendant comprehended his rights at the time that he executed the waiver; and (5) the evidence showed that the police employed a nonconfrontational interview method, and there was no evidence of the type of coercive police activities required to render a confession involuntary.

**17. Search and Seizure— motion to suppress—results of search of cellular telephone**

The trial court did not err in a double first-degree murder case by denying defendant's motion to suppress the results of the search of his cellular telephone, because the seizure was pursuant to defendant's lawful arrest.

**18. Sentencing— death penalty—proportionality**

Sentences of death imposed in a double first-degree murder case were not disproportionate where: (1) the jury found the aggravating circumstances under N.C.G.S. § 15A-2000(e)(5) that each murder was committed while defendant was engaged in the commission of first-degree burglary and under N.C.G.S. § 15A-2000(e)(11) that each murder was part of a course of conduct in which defendant engaged and that included the commission by defendant of other crimes of violence against other persons; (2) our Supreme Court has never found a sentence of death disproportionate in a case where a defendant was convicted of murdering more than one victim; (3) the murders occurred inside the home of one of the victims, and a murder in one's home is particularly shocking, not only because a life was senselessly taken, but because it was taken at an especially private place where a person has a right to feel secure; (4) defendant was convicted of first-degree murders both under the felony murder rule and on the basis of malice, premeditation, and deliberation; and (5) these murders involved the use of at least two semiautomatic assault rifles and a pistol against young, unarmed victims, resulting in multiple close range gunshot wounds to each victim's head or neck.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing a sentence of death entered by Judge V. Bradford Long on 20 December 2006 in Superior Court, Randolph County, upon

jury verdicts finding defendant guilty of two counts of first-degree murder. Heard in the Supreme Court 15 December 2008.

*Roy Cooper, Attorney General, by John H. Watters, Special Deputy Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender; and Thomas K. Maher for defendant-appellant.*

EDMUNDS, Justice.

Defendant George Thomas Wilkerson was indicted for the first-degree murder of Casey Dinoff and for the first-degree murder of Christopher VonCannon. Defendant was also indicted for one count of first-degree burglary. He was tried by jury and on 15 December 2006, was convicted of both counts of first-degree murder on the basis of malice, premeditation, and deliberation and also under the felony murder rule. In addition, defendant was convicted of first-degree burglary, but because the burglary was the felony underlying the felony murder convictions, it merged with the felony murders for sentencing purposes. Following a capital sentencing proceeding, the jury recommended a sentence of death.

Defendant appealed his capital convictions to this Court. We conclude that defendant's trial and capital sentencing proceeding were free from prejudicial error and that defendant's sentence of death is not disproportionate.

Defendant, who sold drugs illegally, lived with his girlfriend Kimberly Kingrey in her apartment in Asheboro, North Carolina. Defendant's source of illicit prescription drugs was William Davis (hereinafter, Mr. Davis), while his source of marijuana and cocaine was Josh Allred. In addition, defendant purchased firearms from Mr. Davis. Defendant's friend Logan Malanowski sold drugs for defendant and delivered them to defendant's buyers. Defendant's friend Joe Ferguson also sold drugs, and Malanowski and Ferguson often stayed with defendant and Kingrey in her apartment.

Victim Casey Dinoff and his brother Corey Wyatt lived with their parents in a mobile home at 6975 Adams Farm Road in Randleman, North Carolina. Adams Farm Road is a two-lane road that runs parallel to North Carolina Highway 220, a four-lane divided highway. A gravel driveway that could be barred by a cattle gate ran from Adams Farm Road to the mobile home. Nighttime illumination was provided

by a porch light near the home's front door and a street lamp in the yard facing the driveway.

The parents of Dinoff and Wyatt were long-distance truck drivers who were away from home on 10 January 2005. That morning, Dinoff called Malanowski to purchase Oxycontin. Malanowski drove Kingrey's silver Ford Taurus to the mobile home to make the delivery, arriving between 2:00 and 3:00 p.m. Malanowski was high and had forgotten to bring the Oxycontin, so he unsuccessfully attempted to sell Dinoff and Wyatt a silver nine millimeter handgun with a laser sight instead. Between 4:00 and 5:00 p.m., Dinoff left with Malanowski to retrieve the Oxycontin from Kingrey's apartment. Malanowski returned about forty-five minutes later, dropping Dinoff off with the Oxycontin. Dinoff and Wyatt began ingesting the Oxycontin and smoking marijuana.

That same afternoon, defendant, who was carrying a black Heckler & Koch pistol whose serial number had been filed off, purchased an AK-type rifle and at least one SKS rifle from Mr. Davis. Mr. Davis had modified the AK-type rifle by adding an automatic trigger mechanism. However, the modification was unsuccessful and the weapon never fired more than eight rounds before jamming. Mr. Davis had also added a folding stock to the SKS. During the transaction, defendant and Malanowski posed with the firearms and defendant, who appeared inebriated, high on drugs, or both, said in a joking manner that he was going to kill some people who had stolen from him. Malanowski agreed that he and defendant planned to kill somebody because "people can't be stealing from us."

During the evening of 10 January 2005, defendant, Malanowski, Ferguson, and Allred consumed drugs at a party in Kingrey's apartment. Defendant was using cocaine and smoking marijuana; Ferguson ingested a large quantity of prescription drugs; and Kingrey used cocaine, smoked marijuana, and took Xanax and Clonopin. At about 8:00 or 9:00 p.m., defendant became frustrated and anxious because he could not find his cocaine. After he and Malanowski searched the apartment for the missing drugs, defendant began to make threatening telephone calls to Dinoff, accusing him of stealing the cocaine, which was worth thirty dollars. Defendant claimed that the cocaine had been laid out in Kingrey's apartment to "test" Dinoff, and he threatened to shoot Dinoff unless he received thirty dollars. Defendant continued to call and threaten Dinoff during the course of the evening.

At least three rifles and two handguns were in Kingrey's apartment at the time of the party. Kingrey described one handgun as black and having no serial number, while the other was silver with a laser sight. Kingrey saw defendant "playing" with the firearms during the party, and after Kingrey went to bed, she heard someone shooting a firearm from the porch. She came out of her bedroom and, believing that defendant had fired the shot, told him to leave and take the guns with him.

Before defendant departed, Kingrey overheard him speaking on the phone, threatening loudly that he was "coming to get" the person to whom he was speaking. Defendant, wearing a black leather jacket, black T-shirt, and black corduroy pants, drove away in Kingrey's silver Ford Taurus. After defendant left, Kingrey noticed that one of the rifles and both handguns were no longer in the apartment. Defendant's favorite grey striped stocking cap was also missing from the apartment after that night. A surveillance video camera at a Quik-Chek in Asheboro, North Carolina, recorded defendant wearing such a hat at 12:12 a.m.

In response to defendant's repeated threats to shoot Dinoff, between 8:00 and 10:00 p.m. Dinoff and Wyatt began calling their friends, including Jason Sharpe and Christopher VonCannon, asking that someone drive to their home and pick them up. Wyatt also called 911. However, when one of Dinoff's friends arrived with his wife, Dinoff sent them away after deciding that he and Wyatt could remain at home.

Randolph County Sheriff's Deputy Todd Blakely responded to Wyatt's 911 call and arrived at the residence around 11:00 p.m. Dinoff and Wyatt met Deputy Blakely at the driveway's cattle gate and explained that defendant had repeatedly threatened to shoot Dinoff over a dispute involving thirty dollars. Deputy Blakely advised Dinoff and Wyatt to swear out a warrant at the magistrate's office, then drove approximately one and one-half miles back down Adams Farm Road to the nearest exit and parked where any vehicle approaching Dinoff and Wyatt's residence would have to pass him. After waiting for twenty to twenty-five uneventful minutes, Deputy Blakely cleared the call and went about his other duties.

Sharpe drove with VonCannon out to the Adams Farm residence around midnight and parked at the cattle gate, where Wyatt met them. Wyatt explained that he and Dinoff had recently received another phone call in which Malanowski said that the missing drugs

had been found and that they were coming to share a quarter bag of marijuana with Dinoff and Wyatt as a "peace offering." Wyatt, Sharpe, and VonCannon began to walk back up the gravel driveway. The porch light was on and a street lamp in the yard lit the driveway.

As they approached the mobile home, they saw two men standing on the porch. The first man, who was wearing a black leather coat and a cap, held a handgun. The second man was wearing a grey sweatshirt with the hood up and carrying a rifle. Wyatt yelled out Logan Malanowski's name. The first man looked up, then kicked open the front door and went inside. Sharpe observed this individual silhouetted against the light in the home and saw that he was carrying a rifle at his side. Wyatt also saw this man enter the home, then immediately afterward heard gunfire and saw flashes of light through the home's windows. Sharpe also heard gunfire. Both Sharpe and Wyatt testified that they saw one man enter the house and heard two types of gunshots.

The second man stepped off the porch and walked toward Wyatt, VonCannon, and Sharpe. Sharpe observed this man standing in the yard in the light of the street lamp, looking at Wyatt, VonCannon, and him. Although Wyatt briefly saw the face of the second man from a distance, he was unable to identify him. However, VonCannon called out either "Logan" or "Joe" and approached the second man, while Wyatt stood in the driveway as Sharpe ran to unlock his car. Sharpe then returned for Wyatt, and the two ran to Sharpe's car. The last time either Wyatt or Sharpe saw VonCannon alive, he was standing in the front yard talking to the second man. Wyatt last saw Dinoff alive in Dinoff's bedroom in the mobile home.

Sharpe drove to the nearest pay telephone, where Wyatt called 911. When reporting the shooting, Wyatt identified defendant, Malanowski, and Ferguson as the perpetrators. Although Sharpe had not seen the face of either man at the scene, he encouraged Wyatt to identify defendant because of defendant's repeated threats in the preceding hours to kill Dinoff.

At about 1:00 a.m., a telephone call from defendant awoke Kingrey. Defendant, who was screaming and difficult to understand, instructed Kingrey to report her car stolen. At that time, Kingrey saw that Ferguson was asleep on her couch. Kingrey placed a 911 call to report that her car was not where she parked it, but added that she did not want to press charges. Shortly thereafter, Kingrey received a call from Allred, who told her that he was coming to her apartment

and to pack up everything illegal because police were on their way to "kick [her] door in." In response to Allred's phone call, Kingrey wrapped in a sheet the two rifles defendant had left in her apartment and threw them into the bushes behind her house. However, when Allred arrived, he helped Kingrey retrieve the rifles from the bushes and pack up the drug paraphernalia. Allred told Kingrey he had driven by Adams Farm Road, where he saw an ambulance at Dinoff's home and Kingrey's Taurus parked on the roadside. Before leaving, Kingrey and Allred shook and slapped Ferguson in an attempt to awaken him, but "he didn't budge." Allred then drove Kingrey to the sheriff's office, stopping on the way to dispose of the contraband at a friend's house.

Deputy Blakely and Randolph County Sheriff's Deputies Williams and Creason were dispatched to the Adams Farm Road residence in response to the shooting. They arrived at approximately 1:08 a.m. and discovered that telephone wires into the home had been cut. Inside the home, they found Dinoff lying on a couch and VonCannon lying on the floor at the entrance to the kitchen. Both were dead. Dinoff had suffered a close range gunshot wound to the left side of his face, a second close range gunshot wound slightly to the left of his nose, a gunshot wound to the front of his right shoulder, two gunshot wounds to his left forearm, and a reentry wound to his chest. A bullet recovered from his body had been fired by the AK-style rifle. A black leather wallet lay on the couch next to Dinoff's right hip. One spent nine millimeter pistol casing and three spent Wolf brand 7.62x39 caliber rifle casings were found in the same room. VonCannon had suffered two gunshot wounds to his neck. A bullet recovered from his body had been fired from the nine millimeter handgun later recovered with the rifles. One spent Winchester brand nine millimeter caliber pistol casing was found in the kitchen. Two additional spent 7.62x39 caliber rifle casings were also found in the area.

In the south bedroom of the mobile home, crime scene specialist Kelly Cummings observed two bullet holes in a closet door and two spent 7.62x39 caliber rifle casings. In the hallway outside the north bedroom, Cummings located a spent 7.62x39 caliber rifle casing and observed a hole in the bedroom door from a bullet that had passed through the striker plate. Inside the north bedroom, Cummings observed two bullet holes in the mattress and located an additional spent 7.62x39 caliber rifle casing. Cummings also found multiple live 7.62x39 caliber rounds throughout the home.

Outside, officers found a twenty dollar bill lying in the center of the driveway. At the tree line across Adams Farm Road and northeast of the crime scene, officers located a 7.62 millimeter caliber SKS-style rifle with a scope and a black aftermarket folding pistol grip stock, and a 7.62 millimeter caliber AK-type rifle with a wood butt stock and black pistol grip. The rifles were concealed together under pine needles and leaves. Nearby, officers also recovered several torn sets of latex gloves and a loaded Heckler & Koch nine millimeter semiautomatic pistol, model USP. The pistol's serial number had been filed off.

Defendant was apprehended at approximately 1:00 a.m. on 11 January 2005 by Randolph County Sheriff's Deputy Joe LaRue. Deputy LaRue was driving northbound on North Carolina Highway 220 in response to the 911 shooting call when he observed an eighteen wheel tractor-trailer with its parking lights on parked on the shoulder of the northbound lane. As he approached, Deputy LaRue saw a person he later identified as defendant hiding in the truck's tandem tires. He shone his high beam lights and spotlight on the wheels and ordered defendant to lie on the ground.

After being taken into custody, defendant told Deputy LaRue that he had been walking to his father's house along Highway 220 and hid under the tractor-trailer after hearing gunshots. When Officer LaRue patted defendant down, he found a set of car keys. Defendant explained that the keys belonged to his girlfriend, whose silver Ford Taurus had broken down and was parked across the road on the shoulder of southbound Highway 220.

Malanowski was apprehended in Randleman, North Carolina, at 8:00 a.m. on 11 January 2005 at a pay telephone in a Lowe's Foods store. A search incident to Malanowski's arrest yielded a pair of wire cutters in one of his pockets.

After defendant's arrest, he gave a series of statements to Detective Aundrea Azelton. When the detective began the interview by attempting to administer defendant's *Miranda* warnings, defendant responded that he understood his rights and said, "No, I don't need a lawyer. Yeah, I'll talk to you." Defendant then signed a printed waiver of his *Miranda* rights. In his first statement, given at 2:54 a.m., defendant denied any involvement in the murders. He related that he left Kingrey's apartment in her car and drove to see his father, who lived near Adams Farm Road. However, he experienced car trouble and, although he turned around to return to Kingrey's, the car broke down on Highway 220. Defendant said he then "heard five blasts,

maybe more, but a series of explosions, one after another." He said that "[i]t sounded like land mines or grenades" and "[w]hen I looked over toward the wooded area, I saw flashes of light." Defendant explained that he saw a mobile home through the woods and that the porch light was on. According to defendant, two white men ran out of the home and drove away. Defendant hid to avoid being injured by shrapnel, believing that he was safest between the truck's tires. While giving this statement, defendant received a call on his cellular telephone from Mr. Davis. Defendant told Mr. Davis that he was at the sheriff's office and was being questioned. Detective Azelton did not want defendant to receive information from outside the interview room, so she seized the phone at the conclusion of defendant's first statement.

Detective Azelton then confronted defendant with information her colleagues had received from Kingrey, telling defendant that Kingrey said he left the apartment with someone else in the car. Defendant responded by giving a second statement in which he said that he had driven Malanowski to Dinoff and Wyatt's residence to sell marijuana. Defendant explained that Malanowski paid him twenty dollars to take him there, but that he made Malanowski walk to the house alone when Kingrey's car broke down. Defendant said he did not think Malanowski had a gun, adding that Sharpe was probably the shooter and may have kidnapped Malanowski. Defendant told Detective Azelton that

Jason[] [Sharpe's] favorite thing to do is, or his MO, Modus Operandi, is he will cut someone's phone lines, kick the door in and go in shooting. . . . Logan said he wanted to go up to Casey[] [Dinoff's] house and get him back. He said he wanted to go kill him. Logan had a handgun with him, a nine millimeter. . . . It must have been him and Jason that did the shooting.

Defendant added that he had fired Malanowski's pistol two days earlier. When a Randolph County Sheriff's detective later collected gunshot residue from defendant, he said the residue on his hands was from that previous incident.

Defendant then changed his statement again, saying that he had driven both Malanowski and Ferguson to the mobile home because they told him they intended to share a bag of marijuana with Dinoff, whom they had falsely accused of stealing Ferguson's cocaine. According to defendant, Malanowski and Ferguson went up to the mobile home while he stayed in the car.

At that point, Detective Azelton took a break to sort out the names defendant had given her and to consult with other. investigators. Based upon additional information received from Kingrey, Detective Azelton returned and confronted defendant, telling him it was unlikely Ferguson left Kingrey's apartment. In response, defendant gave another statement. In this statement defendant said that he and Malanowski went to Dinoff's house intending to scare Dinoff. Because Kingrey's car broke down, they walked through the wooded area to the front door. Defendant said that Malanowski carried a nine millimeter handgun and an AK-type rifle. According to defendant, Malanowski cut the telephone lines, then went to the front porch and kicked in the door. Malanowski entered the house and started shooting, and defendant ran away to his car. Defendant stated that Ferguson and Kingrey were not present and Malanowski was the only shooter. Defendant signed this statement and Detective Azelton took it to the other investigators.

Lieutenant Davis and Detective Julian returned to the interview room with Detective Azelton and, when Lieutenant Davis asked defendant what had happened, defendant admitted that he went to the front door of the mobile home with Malanowski but ran away when the shooting started. However, when Lieutenant Davis and Detective Julian left the room, defendant told Detective Azelton that he went inside the mobile home and searched the pockets of Dinoff and VonCannon while Malanowski held them at gunpoint with the SKS rifle. Defendant said that Malanowski "unloaded the rifle" into Dinoff because Dinoff did not have any money. Defendant said that VonCannon asked to go home, but Malanowski "shot him right in the face" after stating that there could be "no witnesses." Defendant further revised his statement, saying that Malanowski carried two rifles and a handgun. Defendant added that Malanowski wore gloves but he did not. Defendant offered to show Detective Azelton where Malanowski had left the weapons. The weapons and several pairs of torn latex gloves were recovered in the area defendant identified.

While removing defendant's handcuffs before interviewing him, Detective Azelton observed a narrow rubber ring encircling defendant's wrist. After the interview, she noticed the ring was missing. Detective Azelton replaced defendant's handcuffs and, while patting him down, located the ring in defendant's coat pocket. She seized the ring, which later was found to be consistent with a torn latex glove recovered with the firearms.

Two days later, on 13 January 2005, Detective Azelton encountered defendant at the jail. Although defendant had said nothing to her earlier about the twenty dollar bill found in Dinoff's driveway, defendant volunteered that the money was not his. Defendant added that "he had told us that it was his, but what he meant was that the twenty dollars was probably the money [Malanowski] was supposed to pay him for taking him up there. He said that [Malanowski] probably dropped it as he was running from the house." Later that same day, defendant made a written request to speak with Detective Azelton. In his request, defendant stated that if he was allowed to meet with Kingrey first, he would tell investigators "everything" and "the statement I told earlier is a complete and total lie. [T]here were three people, not two." However, when Detective Azelton and Lieutenant Davis met with defendant in person, he declined to talk to them in the absence of Kingrey.

Defendant made another request to speak with Lieutenant Davis. On 15 January 2005, defendant told the lieutenant that he had consumed cocaine the Friday before the shooting and LSD the Saturday before the shooting and had difficulty distinguishing what really happened. He said that he and Malanowski drove to the mobile home, with Ferguson following, and that Malanowski told defendant to wait in the car, then left with some guns. Defendant told Lieutenant Davis that his next memory was being in a police car.

While in custody after his arrest, defendant made a series of recorded telephone calls to Kingrey and Ferguson. During a call made at 8:54 p.m. on 13 January 2005, defendant apologized to Ferguson "for all the trouble" he had caused him, told Ferguson that he wished Ferguson, or somebody, had stopped him from going out that night, agreed that Ferguson was so high he "couldn't move," and encouraged Ferguson to make a statement incriminating Sharpe. In another call made on 19 January 2005 at 7:53 p.m., defendant told Kingrey that he and Malanowski were "in this together." He also stated:

I looked everybody in the eye, that's what scares me . . . is that I had damn—I had a lot more heart than I thought I did. . . . And do you know what scares me even more?

K. Kingrey: What?

G. Wilkerson: That it was easy. There was no second thoughts, no f——ing hesitation, no nothing. It was just like in a damn movie.

During this same conversation, defendant told Kingrey, "If the car would have started, I would have got away clean." Later, in a conversation with Kingrey on 28 January 2005, defendant said he was going to "tell them that Joe [Ferguson] was the third person," but was dissuaded when Kingrey responded that Ferguson was going to be a State's witness who would testify on her behalf.

At trial, Ferguson testified for the State that he had purchased the SKS rifle from Mr. Davis at the same time defendant purchased the AK-style rifle. Defendant did not present evidence but sought to establish through cross-examination that he was not involved in the shootings and that Ferguson, Malanowski, and possibly Allred were the perpetrators.

Additional facts will be set forth as necessary for the discussion of specific issues.

## GUILT-INNOCENCE PHASE

[1] Defendant raises eighteen issues. In his first argument, defendant contends that the State violated his Fourteenth Amendment right to substantive due process by failing to correct false testimony given by its witness Kimberly Davis. She is the wife of William Davis, who allegedly provided drugs to defendant for resale and sold firearms to him. Mrs. Davis testified that, shortly before the murders, defendant and Malanowski came to her home to purchase at least one SKS rifle and an AK-type rifle from her husband. She saw defendant and Malanowski "posing" with the firearms that were sold and testified that defendant "said he was going to go and kill some people because they had stolen from him" and that defendant and Malanowski were "going back and forth about yeah, we're going to go kill somebody, people can't be stealing from us." Mrs. Davis identified State's exhibit number one as the Heckler & Koch pistol defendant was carrying when he arrived at her house, State's exhibit number two as an SKS rifle that her husband sold to defendant and Malanowski, and State's exhibit number three as an AK-type rifle similar to the one that her husband sold to the two men. Both the SKS rifle and the AK-type rifle were recovered across Adams Farm Road, not far from the scene of the shootings. Thus, Mrs. Davis' testimony supported the State's theory that the murders of Dinoff and VonCannon were premeditated revenge killings carried out, at least in part, by defendant.

Prior to defendant's trial, Mrs. Davis was convicted in federal court of maintaining a dwelling for the sale of controlled substances

and possession of a firearm in furtherance of a drug trafficking crime. Mrs. Davis elected to become a cooperating witness and assisted federal authorities in prosecuting her husband and two of his associates for multiple gun and drug crimes. As a result of her substantial assistance, Mrs. Davis' federal sentence was reduced to thirty-five months' imprisonment.

At the time of defendant's trial, Mrs. Davis was serving her federal sentence. Defendant contends that Mrs. Davis gave false testimony when she stated that she had not been promised any additional consideration or sentence reduction from the state prosecutor in exchange for her testimony against defendant. In particular, defendant states that a letter of understanding sent by the state prosecutor to Mrs. Davis' defense attorney establishes that Mrs. Davis expected to receive an additional sentence reduction in exchange for her testimony against defendant. Defendant argues that the State was obligated to correct her false testimony.

As to Mrs. Davis' trial testimony, she denied during her direct examination that she had been promised any reduction in her federal sentence:

Q. Okay. Now Ms. Davis, you said you were in federal custody. Are you testifying here today under the promise of any consideration?

A. No.

Q. Okay. Have you already been sentenced in federal court?

A. Yes, I have.

Q. Have you been told that your attorney would be made aware of your cooperation?

A. Yes.

Q. Okay. Anything been promised to you specifically about your federal sentence?

A. No.

The letter in question, which was not made available to the jury but is part of the record, was sent by the state prosecutor to Mrs. Davis' defense attorney in her federal case. The letter provides:

This letter pertains to your client Kimberly Davis and her testimony in the capital murder cases against George Wilkerson. . . . This letter will set forth the agreement we have regarding Ms.

Davis' testimony. I will provide a copy of this letter to Wilkerson's defense attorneys.

At this point I do expect to call Ms. Davis as a State witness. In exchange for her complete and honest testimony I will commit to making the Federal Court aware of her cooperation and the value in prosecuting Wilkerson. I will do this in any manner required of me, including a letter, deposition, or testimony. I understand that my disclosure may form the basis of a motion to reduce Ms. Davis' federal sentence she is currently serving, and may result in a sentence reduction if the judge rules in her favor.

Ms. Davis should understand that if she is not completely forthright or I find she testifies untruthfully, I will also notify the Federal prosecutors of this fact as well. I reserve the right to subject Ms. Davis to a polygraph if I believe it to be necessary.

I have dismissed the state charges brought against Ms. Davis. This dismissal is because she was prosecuted federally for these offenses. (I have also dismissed the state charges against the other defendants in the matter who were prosecuted federally.) These dismissals are not contingent upon Ms. Davis' cooperation in the Wilkerson case. The dismissals were taken because after talking with [Assistant United States Attorney] Kearns Davis, I believe your client was sentenced appropriately and see no need for subsequent state prosecution. AUSA Davis is of the opinion that your client was truthful and that her cooperation was material and very helpful in the prosecution of the other defendants prosecuted federally.

This letter details the full and complete nature of my agreement and expressed intent regarding Kimberly Davis. If you believe that something else was promised or implied and is not stated in this letter or is stated incorrectly, you must notify me in writing immediately so that we can clear it up. Wilkerson's attorneys have a right to know the full extent of any agreement between the State and Ms. Davis before she testifies. To my knowledge this letter states that completely and accurately. Please let me know if you believe otherwise.

A copy of this letter was contemporaneously provided by the State's prosecutor to defendant's attorney.

When the State obtains a conviction through the use of evidence that its representatives know to be false, the conviction violates

the Due Process Clause of the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221 (1959); *accord State v. Boykin*, 298 N.C. 687, 693-94, 259 S.E.2d 883, 887-88 (1979), *cert. denied*, 446 U.S. 911, 64 L. Ed. 2d 264 (1980). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221. If the false evidence is material in the sense that there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," the defendant is entitled to a new trial. *United States v. Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349-50 (1976); *accord State v. Sanders*, 327 N.C. 319, 336, 395 S.E.2d 412, 424 (1990), *cert. denied*, 498 U.S. 1051, 112 L. Ed. 2d 782 (1991). Evidence that affects the jury's ability to assess a witness' credibility may be material. *See, e.g., Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221 (explaining that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence").

A state prosecutor has no authority to file a motion in federal court seeking the reduction of a federal sentence imposed upon anyone convicted of a federal crime. *See* Fed. R. Crim. P. 35(b)(1). At most, a state prosecutor may notify federal authorities that a federal defendant has cooperated in a state prosecution, with the understanding that the notification may lead a federal prosecutor to move in federal court for a reduction in the defendant's federal sentence on the basis of the defendant's "substantial assistance" in the state prosecution. *Id.* A federal prosecutor's decision whether to make such a motion is discretionary. *Wade v. United States*, 504 U.S. 181, 185, 118 L. Ed. 2d 524, 531 (1992) (holding, in part, that a federal prosecutor has "a power, not a duty, to file a motion when a defendant has substantially assisted"). If the federal prosecutor makes the motion, the decision whether to allow it and reduce a defendant's sentence lies with the United States trial court. 18 U.S.C.A. § 5K1.1 (Thomson/West 2007) (Federal Sentencing Guidelines).

Accordingly, the state prosecutor's agreement to inform federal authorities of Mrs. Davis' truthful testimony did not, and could not, guarantee that Mrs. Davis' sentence would be reduced, nor could the communication of the information to the federal prosecutor directly result in the filing of a motion to reduce Mrs. Davis' sentence. She accurately testified that she had no assurance of an additional reduction in her sentence. There was no quid pro quo and no inaccuracy in her testimony for the prosecutor to correct.

To the extent that Mrs. Davis' testimony may have led jurors mistakenly to believe that she could not receive a benefit from her testimony against defendant, any misunderstanding was corrected by her subsequent admission during cross-examination that she hoped her sentence would be further reduced.

Q. Okay. And I know by your earlier answers, you're saying nothing's been promised to you in this case, correct?

A. Correct.

Q. As far as your coming in here and taking the stand and cooperating, is that correct?

A. That is.

Q. But by testifying in this case you are hoping to get even more hope [sic] on your federal sentence, aren't you?

A. Yes.

Q. Okay. You're not just in here because you're a good citizen, correct? You want something in exchange.

A. Yes.

Q. Okay. And you're hoping to get your thirty-five (35) month jail sentence reduced even further, is that correct?

A. Yes.

Q. And you're hoping that you may even get your jail sentence reduced to the point that you get out of jail?

A. I don't think that's possible.

Q. Is that what you're hoping?

A. I guess it's always good to hope.

Because this exchange accurately explained Mrs. Davis' motive for testifying and her interest in defendant's prosecution, jurors had ample evidence with which to assess her credibility. In addition, the State's closing argument acknowledged the possibility of an additional reduction when the prosecutor stated: "There's no deal with her other than she came in here to tell the truth, and the deal was if she tells the truth then the federal authorities can do whatever they do." Accordingly, the State did not obtain defendant's conviction

**STATE v. WILKERSON**

[363 N.C. 382 (2009)]

through the use of false testimony, nor did the State permit false testimony to go uncorrected. These assignments of error are overruled.

[2] Defendant's next two arguments are related to his *Napue* claim. Defendant's second contention is that he was denied effective assistance of counsel when defense counsel failed to object to or correct Mrs. Davis' false testimony and later affirmatively misstated during closing argument that the prosecutor had not entered into a "deal" with Mrs. Davis. Third, defendant argues that the trial court erred by failing to intervene *ex mero motu* when the prosecutor told the jury during closing argument that Mrs. Davis did not testify pursuant to a "deal." The record indicates that defense counsel extensively cross-examined Mrs. Davis about her federal charges and the benefits she had received in federal court for her cooperation. As detailed above, there was no quid pro quo between the State and Mrs. Davis, and any ambiguity created by Mrs. Davis' direct testimony was corrected on cross-examination. Accordingly, defendant's second and third assignments are overruled.

[3] Fourth, defendant argues that the trial court committed plain error by permitting Detective Azelton to give improper opinion testimony as to whether any evidence implicated Joe Ferguson in the murders. The testimony in question was elicited by the prosecutor during redirect examination of Detective Azelton after defense counsel attempted during cross-examination to establish that Kingrey, who corroborated Ferguson's alibi, had changed her story about Ferguson's whereabouts on the night of the murders. Specifically, Kingrey testified on direct examination that she found Ferguson asleep in her apartment when defendant woke her with a telephone call instructing her to report that her car had been stolen. On cross-examination, she testified that Ferguson was wearing tennis shoes before she went to bed but was wearing boots when defendant's call awakened her about an hour later. She added that, during the following week, Ferguson cleaned those boots every day, focusing on a dark spot that Kingrey thought might be blood. She confirmed under cross-examination that she had not been able to awaken Ferguson after defendant called. When defense counsel asked Kingrey if she later entered into a sexual relationship with Ferguson, Kingrey denied it. Defense counsel did not ask Kingrey if she had ever changed her story relating to Ferguson's behavior the night of the shootings.

Detective Azelton testified thereafter about her investigation of the murders. Defense counsel cross-examined her as to Kingrey's truthfulness. While under cross-examination, Detective Azelton

acknowledged that Kingrey admitted being untruthful to police in aspects of her first statements. However, Detective Azelton further testified under cross-examination that Kingrey had consistently related that Ferguson was asleep in her apartment at the time of defendant's telephone call. Detective Azelton concluded from Kingrey's statements that "[i]f Joe [Ferguson] was at [Kingrey's] apartment and he was asleep, then he wasn't with [defendant]" at the time of the murders.

While being cross-examined, Detective Azelton also denied that Kingrey had told her either that Ferguson had changed from tennis shoes to work boots that night or that Ferguson was obsessed with scrubbing a spot out of the work boots. Detective Azelton added that Ferguson arrived at the police station the morning after the murders wearing tennis shoes and in a photograph of Ferguson taken the morning after the murders, he can be seen wearing tennis shoes.

Thereafter, during redirect examination of Detective Azelton, the prosecutor asked about her investigation of Ferguson's possible involvement in the murders.

> Q. . . . [Defense counsel] asked you a lot of questions about Joe Ferguson. As the lead investigator in this case, what is the sum total of the evidence that you have implicating Joe Ferguson in the murders of Casey Dinoff and Chris VonCannon?
>
> A. None.
>
> . . . .
>
> Q. Is there any reason if you had any evidence against Joe Ferguson why you wouldn't have charged him with first-degree murder?
>
> A. None whatsoever.

Defendant argues that the trial court committed plain error by admitting Detective Azelton's lay opinion that she had no evidence implicating Ferguson. Defendant contends that Ferguson's possible involvement was the "crucial question to be resolved by the jury from the evidence." *Jones v. Bailey*, 246 N.C. 599, 601-02, 99 S.E.2d 768, 770 (1957) (indicating that a witness could not express an opinion as to an opinion or conclusions that "invaded the province of the jury").

Initially, we note that Detective Azelton's testimony that she had no evidence implicating Ferguson is not necessarily an opinion. The

statement describes the results of her investigation and her interpretation of those results. *See generally* 2 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 175, at 3 (6th ed. 2004) (recognizing that "[t]here is no precise definition of either 'facts' or 'opinions,' and no precise line is drawn between them"). Nor is it obvious that her testimony about Ferguson invaded the province of the jury to determine the ultimate issue of defendant's guilt. When, as here, multiple perpetrators act in concert, one suspect's involvement does not necessarily vitiate the culpability of another. *State v. Thomas*, 325 N.C. 583, 595, 386 S.E.2d 555, 561 (1989). Detective Azelton's exclusion of Ferguson did not ipso facto implicate defendant. Therefore, we conclude that Detective Azelton's statement that she did not possess evidence against Ferguson was not equivalent to a statement that she believed defendant was guilty.

Moreover, assuming *arguendo* that Detective Azelton's testimony was an otherwise inadmissible opinion, it was properly admitted under the circumstances presented here. We have observed that "the law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself" in circumstances in which evidence, otherwise unexplained, is likely to mislead the jury. *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981) (reasoning that the defendant's testimony that he had volunteered to take a lie detector test, if "unexplained, could well lead the jury to believe that the State had refused to give [the] defendant such a test, or that [the] defendant had taken the test with favorable results"). "Such evidence is admissible to dispel favorable inferences arising from [the] defendant's cross-examination of a witness." *State v. Johnston*, 344 N.C. 596, 605-06, 476 S.E.2d 289, 294 (1996). Defendant's cross-examination of Detective Azelton elicited the possibilities that Kingrey was untruthful, that Ferguson shot the victims, and that Detective Azelton failed properly to evaluate Ferguson as a suspect. In so doing, defendant opened the door to redirect examination establishing both that Azelton had considered these possibilities and the reason she excluded them. The trial court did not commit plain error in allowing this testimony. This assignment of error is overruled.

[4] Fifth, defendant argues that the trial court erred by overruling his objection when Kingrey testified that the reason she removed contraband from her apartment the morning after the murders was because she believed defendant had killed someone. Defendant argues the testimony was inadmissible because Kingrey did not per-

sonally know that defendant killed someone and, as a result, the testimony was an impermissible opinion as to his guilt.

As detailed above, Kingrey's testimony on direct examination established that defendant, Malanowski, and Ferguson ingested drugs at a party in Kingrey's apartment on the night of the murders and that when defendant left in Kingrey's car, he took at least one rifle and two handguns with him. Before he departed driving Kingrey's car, defendant made a phone call, during which Kingrey heard defendant loudly say that he was "coming to get" the person he had called. At about 1:00 a.m., an obviously upset defendant called Kingrey from his cell phone and told Kingrey to report her car stolen. Shortly thereafter, Josh Allred, who supplied defendant with cocaine and marijuana for resale, called Kingrey to say that he was coming to the apartment. Kingrey wrapped the two remaining rifles in a sheet and threw them into bushes behind her apartment. When Allred arrived, he helped Kingrey retrieve the rifles and pack up the drug paraphernalia. Allred then drove Kingrey to the sheriff's department, stopping to dispose of the contraband on the way.

Defense counsel's cross-examination questions of Kingrey appeared to implicate Allred by emphasizing his knowledge of the murders and his role in cleaning up Kingrey's apartment. After acknowledging that Allred had been charged as an accessory and that he always carried a gun, Kingrey confirmed that Allred telephoned to tell her to pack up everything illegal because police were on their way to "kick [her] door in" and that Allred asked for the guns as soon as he arrived. Kingrey also confirmed that Allred told her that he had been to Adams Farm Road where he saw an ambulance at Dinoff's home, that Kingrey's Taurus had been parked on the roadside, and that someone had been shot.

Defense counsel further elicited that defendant did not tell Kingrey to hide the rifles. This line of questioning included the following exchange:

Q. And he [Allred] told you you needed to quote, pack your shit, didn't he?

A. Yes, he did.

Q. By that, what did he mean you needed to pack?

A. Anything that was illegal.

. . . .

Q. And is that why you took the guns and wrapped them in the blanket and put them in the bushes?

A. No, sir. They were already in the bushes when I had done that. He asked me to go outside and get them back out of the bushes and bring them in so he could take them.

Q. All right. Why did you put the guns in a blanket and go outside and put them in a bush then?

A. I was scared. I didn't want them in my house.

Q. All right. What were you scared of?

A. I heard [defendant] acting erratically on the telephone and I knew something had gone wrong.

On redirect examination, the prosecutor asked Kingrey to explain her testimony:

Q. [Defense counsel] asked you a bunch of questions about why you cleaned the apartment out, why you did those things. He never asked you the ultimate question. Why were you doing those things? What did you think George [defendant] had done?

A. Uh—

[Defense Counsel]: We'll object as to what she thought he had done.

[Prosecutor]: I think the door's been opened by the extensive questioning on that.

[Defense Counsel]: Not on that issue.

The Court: Overruled. Ask the question again, please.

Q. [Prosecutor:] What did you think George [defendant] had done when you were cleaning out the apartment?

A. I thought that he probably had killed somebody because he left with guns and he was on drugs that really altered his perception.

Generally, "[a]ll relevant evidence is admissible." N.C.G.S. § 8C-1, Rule 402 (2007). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." *Id.* Rule 403 (2007). Even though a defendant may

open the door to otherwise inadmissible testimony, as explained above, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." *Id.* Rule 602 (2007).

A witness is testifying from personal knowledge when she describes her own state of mind and explains the thoughts motivating her own behavior. Kingrey's redirect testimony explained why she removed the guns and drugs from her apartment. This testimony showed that she, acting alone, made the decision to hide the guns because she knew defendant had left the apartment with firearms and under the influence of drugs and, as a result of what she had seen and heard, feared that he had shot someone. This information explaining why she acted as she did was within Kingrey's personal knowledge and was admissible to clarify evidence elicited by defense counsel on cross-examination. Kingrey's explanation of her motivation was not an opinion as to defendant's guilt. These assignments of error are overruled.

**[5]** Sixth, defendant argues that the trial court committed plain error when it permitted eyewitness Jason Sharpe to testify during cross-examination that he knew in his heart who shot Dinoff and VonCannon and that defendant "was the ringleader of everything." Defendant argues that this testimony was inadmissible because Sharpe was unable to identify either of the two individuals he saw at Dinoff's home during the murders, and therefore, Sharpe did not have personal knowledge that defendant was the shooter. Defendant argues that, as a result, this testimony was an impermissible opinion as to defendant's guilt. Defendant did not move to strike Sharpe's testimony at trial.

Sharpe's direct examination testimony established that he was standing in Dinoff's driveway at the time of the murders. Sharpe had driven to the mobile home with VonCannon to pick up Dinoff and Wyatt, whom they believed to be "in fear of their lives" after receiving threats from defendant. Sharpe knew defendant was angry because defendant believed Dinoff had stolen drugs from him earlier that day.

Wyatt met Sharpe and VonCannon at the entrance to Dinoff's driveway, where Wyatt told Sharpe that, although defendant and Malanowski had made threats, "one of them called back" to say they found the missing drugs. According to Wyatt, defendant and Malanowski were on their way to Dinoff's home to "make up" by

sharing a quarter bag of marijuana with Dinoff and Wyatt. Sharpe testified that he thought this "sudden" change in defendant's and Malanowski's moods was "weird."

Sharpe walked toward the mobile home and, as he approached, heard a loud noise, like the sound of a door being kicked in, and saw a person standing in the doorway, holding a rifle in one hand. Sharpe heard VonCannon shout at a second person who was standing off to the left side of the home. Then Sharpe noticed that the first person had gone inside the home. Gunfire ensued, and Sharpe described hearing two distinct types of gunshots. He then drove Wyatt to a service station where Wyatt called 911.

During cross-examination, defense counsel attempted to establish that Sharpe did not know defendant was at the mobile home because he did not actually see the faces of the two men who committed the murders. Although Sharpe twice conceded that he could not testify that he saw defendant's face, in answering subsequent questions Sharpe volunteered that he believed both that the murders were not random and that they were committed by defendant because defendant had threatened Dinoff and Wyatt. Additional cross-examination clarified that Sharpe knew the threats were made by a "clique group" that included Malanowski and Ferguson, as well as defendant. When defense counsel asked Sharpe to confirm again that he could not identify the shooter, Sharpe responded: "I didn't see his face. But I know in my heart one hundred percent without a doubt that I know the person that shot them." Defense counsel did not move to strike Sharpe's response.

Thereafter, during recross-examination, defense counsel attempted to establish that Sharpe's initial statement to police included Malanowski and Ferguson as possible perpetrators, but not defendant. When confronted with his previous statement, Sharpe responded in part: "I don't know why I wouldn't have mentioned George Wilkerson's [defendant's] name. I mean because pretty much, he was the ringleader of everything. . . . [Defendant] was the main one person that I do believe had the main thing to do with it." Again, counsel did not move to strike Sharpe's response.

Defendant argues that because Sharpe was not able to identify either intruder he saw at Dinoff's home, he lacked personal knowledge that defendant was the shooter, and therefore, his testimony was an impermissible opinion as to defendant's guilt. The State responds that if the disputed testimony was improper, the error was

invited because the testimony was elicited by defense counsel during cross-examination. N.C.G.S. § 15A-1443(c) (2007) ("A defendant is not prejudiced . . . by error resulting from his own conduct."). For the reasons stated below, we conclude that defense counsel did not invite Sharpe's nonresponsive outburst but that admission of the testimony did not amount to plain error.

A witness' testimony is nonresponsive if it exceeds the scope of the question or fails to answer the question. *See State v. Peele*, 281 N.C. 253, 258-59, 188 S.E.2d 326, 330-31 (1972). Here, defense counsel asked Sharpe two narrow questions: (1) "[Y]ou didn't see the person as so [sic] you can identify who it is, did you?" and (2) "You never mentioned George Wilkerson, did you? . . . Would you like to look at your statement?" Sharpe's responses that he knew in his heart who killed Dinoff and VonCannon and that defendant was "the ringleader of everything" were neither within the scope of defense counsel's questions nor given in response to a question. Thus, these answers were nonresponsive. Moreover, these answers were not based upon Sharpe's personal knowledge, as required by N.C.G.S. § 8C-1, Rule 602. Therefore, Sharpe's answers were improper and inadmissible.

Nevertheless, even if a cross-examination answer is nonresponsive, a defendant must move to strike the answer or the objection is waived. *State v. Chatman*, 308 N.C. 169, 177-78, 301 S.E.2d 71, 76-77 (1983). Because defendant did not make such a motion, we review admission of this evidence for plain error. N.C. R. App. P. 10(c)(4); *State v. Mitchell*, 328 N.C. 705, 711, 403 S.E.2d 287, 290 (1991).

Plain error is error "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988). "We find plain error 'only in exceptional cases where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.' " *State v. Hammett*, 361 N.C. 92, 98, 637 S.E.2d 518, 522 (2006) (citation and internal quotation marks omitted).

The transcript demonstrates that Sharpe was hostile toward defendant and resisted defense counsel's attempts to control cross-examination. Even so, defense counsel effectively established that Sharpe was unable to see the face of either assailant and impeached Sharpe by confronting him with a prior inconsistent statement to

police in which Sharpe failed to name defendant as a possible perpetrator of the crimes. Thus, defense counsel elicited information that diminished the force of Sharpe's nonresponsive statements. In light of other evidence presented by the State, we do not believe the trial court committed plain error by not striking this evidence *ex mero motu*. These assignments of error are overruled.

[6] Seventh, defendant argues that defense counsel's assistance was rendered ineffective by his failure to move to strike Sharpe's volunteered statements. To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) defense counsel's "performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984); *accord State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). Counsel's performance is defective when it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693. A defendant is prejudiced by deficient performance when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 80 L. Ed. 2d at 698; *see also Braswell*, 312 N.C. at 563, 324 S.E.2d at 248. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698.

As detailed above, defense counsel elicited Sharpe's concession that he did not see the face of either perpetrator. Counsel also impeached Sharpe with a prior inconsistent statement to investigators in which Sharpe did not identify defendant as a participant. In so doing, counsel significantly undercut the impact of Sharpe's opinion as to the assailant's identity. Other evidence, recited in detail above, established that defendant armed himself, went to Dinoff's home to avenge a perceived wrong, and later told his girlfriend that "it was easy. . . . just like in a damn movie." On this record, we cannot say that Sharpe's inadmissible testimony probably resulted in the jury returning a different verdict than it would have reached had the evidence not been admitted. Because defendant was not prejudiced, his counsel was not ineffective in failing to strike Sharpe's inadmissible testimony. This assignment of error is overruled.

[7] Eighth, defendant argues that the trial court erred by permitting Mrs. Davis to testify that defendant purchased drugs and guns from her husband on the day of the murders. Defendant asserts that the testimony was inadmissible because Mrs. Davis did not actually witness the purported sales and could not testify from personal knowl-

edge that the sales took place. Mrs. Davis' testimony was admitted over defendant's objection.

Mrs. Davis testified that Mr. Davis had robbed two pharmacies and sold the stolen prescription drugs from their home. The drugs were kept in the back bedroom and all sales were made in that room as well. According to Mrs. Davis, her friend Marcos Cruz brought defendant to her house either on the day of the murders or the day before. Defendant spoke with Mr. Davis, and the two then went into the back bedroom together. Mrs. Davis understood that Cruz had brought defendant to the house for the purpose of buying drugs and concluded that the reason her husband took defendant into the back bedroom was to sell defendant prescription drugs.

On the day of the murders, defendant telephoned Mr. Davis. After speaking with defendant, Mr. Davis left the house and later returned with three SKS rifles that he placed on the dining room table, along with an AK-style rifle. Defendant thereafter arrived with Malanowski and the two began joking, posing with the guns to determine who looked better with which weapon. Mrs. Davis heard defendant say that he was going to kill some people because they had stolen from him, though he appeared inebriated and spoke in a joking manner. The entire transaction lasted between twenty and thirty minutes, during which time Mrs. Davis was sitting in an adjoining room. Mrs. Davis testified that after defendant left, the AK-style rifle and at least one SKS rifle were gone and her husband then had more than one thousand dollars in cash. Based upon what she had heard and seen, Mrs. Davis testified that defendant bought and paid for the AK-47. Defendant objected to Mrs. Davis' testimony that defendant purchased drugs and guns from her husband.

As discussed above, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C.G.S. § 8C-1, Rule 602. However, " 'personal knowledge is not an absolute but may consist of what the witness thinks he knows from personal perception.' " *Id.* cmt. (quoting advisory committee's note). In addition, a witness who is not testifying as an expert may testify to an opinion or inference that is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C.G.S. § 8C-1, Rule 701 (2007).

As to the alleged drug transaction, although N.C.G.S. § 8C-1, Rule 701 allows a lay witness to offer an opinion rationally based upon her

perceptions, in this instance Mrs. Davis' perception was simply that her husband sold drugs out of the back bedroom and that he went into the back bedroom with defendant. She did not hear defendant ask for drugs or see any drugs. Because the evidence supporting Mrs. Davis' assumption that her husband sold drugs to defendant is not based upon personal knowledge or perception, and because her infer-ence that a drug deal occurred is a supposition based largely on guesswork and speculation, we conclude that the trial court erred in overruling defendant's objection to this testimony.

Even so, evidentiary error does not necessitate a new trial unless the erroneous admission was prejudicial. *State v. Alston*, 307 N.C. 321, 339-40, 298 S.E.2d 631, 644 (1983); *see also State v. Hickey*, 317 N.C. 457, 473, 346 S.E.2d 646, 657 (1986) (stating that "erroneous admission of hearsay is not always so prejudicial as to require a new trial"). A defendant is prejudiced by evidentiary error "when there is a reasonable possibility that, had the error in question not been com-mitted, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (2007). "The burden of showing . . . prejudice under [subsection 15A-1443(a)] is upon the defendant." *Id.*; *accord State v. Milby*, 302 N.C. 137, 142, 273 S.E.2d 716, 720 (1981). In light of the other evidence against defendant and the relative insignificance of this evidence of one purported drug sale, we further conclude that the error was not prejudicial.

Turning next to Mrs. Davis' testimony that her husband sold one or more firearms to defendant, although she did not witness a com-plete transaction in that she did not see money change hands, Rule 701 permits a lay witness to testify to an inference that is "(a) ratio-nally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C.G.S. § 8C-1, Rule 701. When Mrs. Davis testified that she observed that her husband had procured firearms after speaking with defendant; that when defendant and Malanowski arrived, Mr. Davis showed the weapons to defendant; that she heard defendant explain his need for a firearm; that she noticed that weapons were missing from the house after defendant departed; and that afterwards she saw that her husband had a substantial amount of cash, we conclude that Mrs. Davis' natural inference that a sale took place is supported by her perceptions and is admissible under Rule 701. *See generally* 2 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 175, at 2-4 (6th ed. 2004).

Moreover, even if Mrs. Davis' testimony that her husband sold the weapons to defendant was improper, any error in its admission was not prejudicial. The gravamen of her testimony was that defendant obtained from her husband weapons with which to kill "some people" who had stolen from him. Whether or not defendant obtained them through a sale is immaterial. Accordingly, there is no "reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a). These assignments of error are overruled.

[8] Defendant's ninth argument is that the trial court erred by permitting Wyatt to testify over defendant's objection that Dinoff told him defendant had threatened them both in a telephone call. Defendant argues that Dinoff's statement to Wyatt was inadmissible hearsay and that the State failed to establish a foundation for admission of the statement under the excited utterance exception in section 8C-1, Rule 803(2).

Wyatt testified that on the day of the murders, Dinoff called Malanowski to purchase some Oxycontin. When Malanowski arrived, he had forgotten the drugs and instead unsuccessfully attempted to sell Wyatt and Dinoff a handgun. Dinoff left with Malanowski and the two returned forty-five minutes later with the Oxycontin. After Malanowski dropped Dinoff off, Wyatt and Dinoff began smoking marijuana and taking Oxycontin.

Shortly after Malanowski left, Dinoff received a telephone call. Wyatt testified that Dinoff was visibly upset by the call. Dinoff told Wyatt that defendant had accused him of stealing cocaine worth thirty dollars when he went with Malanowski to get the Oxycontin. Dinoff told Wyatt that defendant said the cocaine had been "laid out" to "test" him. According to Wyatt, Dinoff said defendant threatened to kill him. Thereafter, Dinoff continued to receive additional calls from a person purportedly making the same accusations and threats. As a result of receiving the threats, Wyatt and Dinoff telephoned friends to come and pick them both up. Wyatt also called 911. Defendant objected to Wyatt's testimony about the conversation between defendant and Dinoff, arguing that Dinoff's description of the contents of the calls was inadmissible hearsay and that the State did not lay a proper foundation for its admission under the excited utterance exception.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove

the truth of the matter asserted." *Id.* § 8C-1, Rule 801(c) (2007). Although hearsay is generally not admissible, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. *Id.* Rule 803(2) (2007). Whether a statement is an excited utterance is determined by the state of mind of the speaker. *State v. Smith*, 315 N.C. 76, 86-87, 337 S.E.2d 833, 841 (1985). To fall within the exception, the proponent must establish that there was "(1) a sufficiently startling experience suspending [the declarant's] reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *Id.* at 86, 337 S.E.2d at 841.

Wyatt's testimony established that receiving the call surprised Dinoff, who became visibly upset during the call and immediately afterwards related to Wyatt that defendant had made the call and had threatened to kill Dinoff. Dinoff believed defendant wrongfully accused him of stealing cocaine and was disturbed enough to telephone a friend and ask for transportation. Dinoff's statements represented a spontaneous reaction to an event that was sufficiently startling to suspend his reflective thoughts. Accordingly, we conclude that Wyatt's testimony laid a sufficient foundation for admission of Dinoff's statements as excited utterances. These assignments of error are overruled.

[9] Tenth, defendant argues that the trial court committed plain error by admitting the entire tape recording of Wyatt's call to 911 just before the shooting. During the call, Wyatt told the 911 dispatcher that:

> some people have just called and threatened my life and my family and stuff and told me that my brother stole something from them. And that—they said that if they come up here and they don't get their money and stuff, that they're gonna shoot us. . . . And I need—I need like someone to patrol my area, like, down my road and stuff.

After providing his name, address, and telephone number, Wyatt continued:

> It's a guy named George, and there's a—there's another guy— The other two guys, I know their full names. It's Logan Malanowski and Joe Ferguson. And they're driving a silver Ford Taurus.

> . . . .

911:  Do you think they're on their way?

C. Wyatt:  He told me that they'd be here in 15 minutes, and we need a car up here. And we're possibly—we're possibly gonna leave. But more than likely they'll rob us.

. . . .

911:  Do you think they'll have weapons?

C. Wyatt:  Yeah. He told—they got guns. I know they got guns. They got guns with little laser pointers on them. They got .09 millimeters.

. . . .

911:  . . . And they stated they would kill you?

C. Wyatt:  They told me that if—you know, if they did not get thirty bucks, that they were going to shoot anyone who came across them.

Defendant argues that the trial court should not have admitted Wyatt's statement that "more than likely they'll rob us" because Wyatt was speculating about defendant's intention. Defendant contends that the prejudicial effect of this statement substantially outweighed any probative value it may have had. The trial court overruled defendant's initial request to redact the statement. Because defendant did not renew this objection when the tape was played and the transcript published to the jury, defendant correctly asserts only that admission of the statement constitutes plain error.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2007). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." *Id.* Rule 403. " 'Unfair prejudice,' as used in Rule 403, means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one.' " *State v. DeLeonardo,* 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986) (quoting N.C.G.S. § 8C-1, Rule 403 cmt.).

Here, Wyatt's statement was relevant to explain to the dispatcher why he felt threatened by defendant and why he called 911. Defendant argues that the statement was nevertheless unfairly prejudicial because armed robbery was the predicate felony supporting

the charges of burglary and first-degree murder. Defendant contends that Wyatt's statement in the 911 call encouraged jurors to conclude that defendant intended to commit armed robbery when in fact, Wyatt was only speculating. According to defendant, admission of the statement deprived him of a fair trial. However, Wyatt related in the 911 call the threatening caller's own statement concerning his motive: "They told me that if—you know, if they did not get thirty bucks, that they were going to shoot anyone who came across them." In context, this statement may be understood as a threat to take thirty dollars from Wyatt and Dinoff at gunpoint or, in other words, as a threat to commit armed robbery. Wyatt's comment that it was more than likely they were going to commit a robbery merely clarifies and restates this evidence, to which defendant did not object. For the reasons stated above, we conclude that the probative value of the disputed evidence was not substantially outweighed by the danger of unfair prejudice. Admission of the statement was not error, plain or otherwise. This assignment of error is overruled.

[10] Defendant's eleventh argument is that the trial court erred by admitting the police report created at the time of Mr. Davis' arrest. The report was admitted for the purpose of establishing Mr. Davis' cellular telephone number. At defendant's trial, the State showed that the cell phone number, which was provided by Mr. Davis upon his arrest, was the same number defendant dialed while hiding under the tractor-trailer on Highway 220 immediately after the shooting. The State called as a witness the cell phone report's record creator, Randolph County Sheriff's Department Captain Barry Bunting, and moved to admit the police report as a business record. Defendant objected, conceding that the report was an admissible business record but arguing that the information contained within that business record was information constituting inadmissible hearsay. The trial court overruled defendant's objection and admitted the report as substantive evidence. In so doing, the court concluded that the reliability of Mr. Davis' statements to police was a question of weight, not admissibility, and that "the reliability of that information is subject to cross examination . . . of [the arresting officer] by defendant's counsel." On appeal, defendant also argues that admission of this hearsay evidence violated his Sixth Amendment right to confront witnesses against him, namely Mr. Davis.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c). Here,

as at trial, defendant concedes that the primary document, Mr. Davis' arrest report, is an admissible business record. However, defendant contends the telephone number contained in the report memorializes an assertion made by Mr. Davis at the time of his arrest and is therefore hearsay. The State does not argue that the phone number meets any statutory hearsay exception, nor do we see any applicable exception. Hearsay statements that do not meet a statutory exception are presumptively unreliable and inadmissible. *Id.* Rule 802 (2007). Accordingly, the trial court erred by admitting the portion of Mr. Davis' arrest report that contained his cell phone number.

As explained previously, evidentiary error does not necessitate a new trial unless the error was prejudicial. *Alston*, 307 N.C. at 339-40, 298 S.E.2d at 644. Defendant argues that erroneous admission of Mr. Davis' cell phone number was prejudicial because defendant's telephone contact with Mr. Davis was important circumstantial evidence that tended to show defendant was the shooter. However, in light of the entire case presented by the State, defendant has not established that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached" by the jury. N.C.G.S. § 15A-1443(a). Other substantial evidence presented by the State established defendant's intent to shoot Dinoff, his purchase and possession of the murder weapons, his presence in the mobile home at the time of the shooting, his attempt to cover up his actions, and his inculpatory statements made while awaiting trial. In addition, the State offered other evidence from which jurors could conclude defendant called Mr. Davis after the murders, including Mrs. Davis' testimony that Mr. Davis received a telephone call at approximately 1:00 a.m. on the night of the murders, defendant's cell phone records, which showed he made multiple calls shortly after the murders, and Mr. Davis' call to defendant's cell phone during defendant's interview with Detective Azelton. Accordingly, the trial court's erroneous admission of Mr. Davis' phone number was not prejudicial.

Although defendant also argues that admission of this hearsay violated his Sixth Amendment right to confront Mr. Davis, defendant did not object on this basis before the trial court. "[C]onstitutional error will not be considered for the first time on appeal." *State v. Chapman*, 359 N.C. 328, 366, 611 S.E.2d 794, 822 (2005); *see also* N.C. R. App. P. 10(b)(1) ("In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the rul-

ing the party desired the court to make if the specific grounds were not apparent from the context."). Because defendant did not raise this constitutional issue at trial, he has failed to preserve it for appellate review and it is waived. *Chapman*, 359 N.C. at 366, 611 S.E.2d at 822. Accordingly, this assignment of error is overruled.

[11] Twelfth, defendant argues that the trial court erred by admitting over his objection Jason Sharpe's testimony as to the reputation of victim VonCannon for peacefulness. When the prosecutor asked Sharpe, "What was his [VonCannon's] reputation for peacefulness?," Sharpe responded:

> For peacefulness? He wasn't a violent person, I know that. I mean, yeah, he's a little crazy, you know, like we all were, you know, I mean we were young punks, you know, you know, you know, I mean we do drugs and stuff, but I mean he wasn't the type of person to just maliciously, you know, just want to create random acts on people and you know, get in fights with people and stuff like that. He was always an easygoing laid back kind of guy.

Evidence of a victim's character is inadmissible during the guilt-innocence phase of a capital trial unless offered by the accused to show a "pertinent trait of character of the victim of the crime" or by the State "to rebut the same." N.C.G.S. § 404(a)(2) (2007). Therefore, "the State cannot introduce evidence of the victim's peacefulness until after defendant has put forward evidence that the victim was the first aggressor." *State v. Faison*, 330 N.C. 347, 356, 411 S.E.2d 143, 148 (1991). Here, there was no such evidence, and the State concedes that the trial court erred by admitting the testimony.

Nevertheless, as discussed above, evidentiary error does not require reversal unless the error was prejudicial, *Alston*, 307 N.C. at 339-40, 298 S.E.2d at 644, and the burden of showing prejudice is on the defendant, N.C.G.S. § 15A-1443(a); *Milby*, 302 N.C. at 142, 273 S.E.2d at 720. For purposes of section 15A-1443(a), prejudice means "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a).

The prejudicial effect of character evidence is usually understood to be its tendency to persuade jurors that the person being described acted in conformity with his or her reputation for having a certain character trait. *See, e.g., id.* § 8C-1, Rule 404 cmt. (" 'Character evi-

dence is susceptible of being used for the purpose of suggesting an inference that the person acted on the occasion in question consistently with his character.' " (quoting advisory committee's note)). Accordingly, the prejudicial effect of Sharpe's testimony that VonCannon was not a violent person would be its tendency to persuade jurors that VonCannon was not violent on the night he was killed. After reviewing the record as a whole, we are satisfied that defendant was not prejudiced by this testimony. Other evidence showed that two men armed with at least two semiautomatic assault rifles and a pistol murdered the unarmed victims. Defendant acknowledges in his brief that all admissible evidence indicates VonCannon did not provoke the attack, and, in fact, no evidence indicates that any aspect of VonCannon's character played any role in the events of 10 and 11 January 2005. Accordingly, we conclude that any prejudicial effect arising from the admission of this inadmissible character evidence was de minimis. There is no reasonable possibility that a different result would have been reached at trial had the disputed testimony been excluded.

Defendant nevertheless argues that the prejudicial effect of the evidence was to "engender undue sympathy for a person having simply been in the wrong place at the wrong time." However, Sharpe's description of VonCannon is a genuinely mixed bag, on the one hand characterizing him as "crazy," a "young punk," and a drug user, while on the other hand depicting him as not violent or malicious, and "easygoing." This testimony does not paint a particularly appealing picture and would not necessarily generate sympathy for VonCannon. Moreover, this short testimony was given in response to a single question. After reviewing Sharpe's testimony in context and considering the entirety of the State's evidence, we conclude that this disputed testimony did not encourage jurors to convict defendant out of sympathy for VonCannon. This assignment of error is overruled.

**[12]** Thirteenth, defendant argues that the trial court erred by failing to intervene *ex mero motu* during the prosecutor's guilt-innocence phase closing argument. Specifically, defendant contends that the prosecutor argued facts not in evidence when he told the jury the reason Allred advised Kingrey that defendant and Malanowski had shot someone was that defendant had given Allred this information in a telephone call following the shootings. Defendant also contends that the prosecutor improperly argued that Allred knew to clean out Kingrey's apartment because of defendant's supposed call to Allred:

And do you know that Josh Allred, the testimony is, shows up at the apartment and what does he say according to Kimmey Kingrey? He says George and Logan done shot somebody. We gotta get this sh-t out of the apartment. Now how did he know that? How does Josh Allred know that? He knows it because on the side of the road George Wilkerson called him and said man, go clean my apartment out. Kimmey's got no car, because the car is right there. I gotta deal with my car and I gotta deal [with] my apartment, so clean them guns and the dope out of the apartment.

Defendant emphasizes that the State did not call Allred as a witness to testify to the substance of the phone call.

Defendant further argues that the prosecutor, while discussing the theory of acting in concert, improperly told jurors that Malanowski would also be tried for involvement in the killings. Defendant states that this argument "minimized the importance for the jury in determining whether the evidence supported Wyatt's identification of Malanowski or supported the State's contention that [defendant] fired the shots."

In a closing argument in a criminal trial, "an attorney may not . . . make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice." *Id.* § 15A-1230(a) (2007). "Counsel may, however, argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom." *State v. Alston,* 341 N.C. 198, 239, 461 S.E.2d 687, 709-10 (1995) (citing *State v. Syriani,* 333 N.C. 350, 398, 428 S.E.2d 118, 144 (1993)), *cert. denied,* 516 U.S. 1148, 134 L. Ed. 2d 100 (1996). "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu.*" *State v. Jones,* 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002).

Here, the prosecutor's argument that Allred knew about the murders because defendant told him about them is a reasonable inference that can be drawn from evidence introduced through telephone records and the testimony of Detective Azelton indicating that defendant's cellular telephone was used to make several calls to Allred's cellular telephone around the time the murders were committed. Similarly, the prosecutor's argument that Allred thus knew to advise Kingrey to clean out her apartment may be inferred from the

same evidence. *State v. Frye*, 341 N.C. 470, 498, 461 S.E.2d 664, 678 (1995) ("Prosecutors may, in closing arguments, create a scenario of the crime committed as long as the record contains sufficient evidence from which the scenario is reasonably inferable."), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996). The prosecutor's arguments drew reasonable inferences from this evidence and were not improper, let alone grossly improper.

Moreover, the prosecutor's argument that defendant and Malanowski would be equally guilty was an accurate statement of law applicable to the State's theory of the case, which was that defendant and Malanowski acted in concert to commit the murders. "Under the doctrine of acting in concert when two or more persons act together in pursuance of a common plan or purpose, each is guilty of any crime committed by any other in pursuance of the common plan or purpose." *Thomas*, 325 N.C. at 595, 386 S.E.2d at 561; *see also State v. Joyner*, 297 N.C. 349, 356-57, 255 S.E.2d 390, 395 (1979). The trial court instructed the jury on the State's theory after determining that the State presented sufficient evidence from which jurors could find that defendant and Malanowski acted in concert. Because section 15A-1230(a) permits counsel to argue applicable law, the prosecutor's argument was not improper. These assignments of error are overruled.

[13] Fourteenth, defendant argues that the trial court erred by failing to intervene *ex mero motu* when the prosecutor expressed personal opinions during closing arguments in the guilt-innocence phase of defendant's trial. Specifically, defendant states that the prosecutor committed gross impropriety by vouching for the credibility of Mrs. Davis and Kimberly Kingrey when he argued:

> Did you hear on cross-examination him damage [Mrs. Davis'] credibility one bit? She was matter of fact, *she told the truth*, and what she said is corroborated, and I'll get to some of that later.
>
> . . . .
>
> [Kimberly Kingrey] does get into some bizarre testimony that she thinks that Josh Allred is wearing boots. But I told you the pictures [sic] that he's not wearing boots when he's taken to—down to be questioned. He's wearing skateboarder tennis shoes. What's Kimmey Kingrey talking about? I don't know. *I put Kimmey Kingrey up as my witness because I think she's telling the truth*, but is she or was she at the time someone that is a likeable per-

son? No, she's not. I don't pretend that she is. But I do know that the evidence is consistent with her testimony. (Emphasis added.)

Defendant further avers that the prosecutor improperly argued his personal belief in defendant's guilt when he said:

If two or more persons join in a common purpose to commit murder, each of them if actually or constructively present is not only guilty of that crime if the other person commits the crime but is also guilty of any other crime committed by the other in pursuance of the common purpose to commit murder or as a natural or probable consequence thereof. Common sense. If you and I form the intent and yet I'm constructively present or actually present, but you do all the acts, we're both guilty, and that's why Logan Malanowski's day is coming in that seat. Even though he has admitted killing both of these victims and the evidence is overwhelming that he did, Logan Malanowski is charged, you've heard the evidence, and he's going to be sitting there soon. *Because under this theory of acting in concert, he's just as guilty as [defendant]*. (Emphasis added.)

As above, "[t]he standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *Jones*, 355 N.C. at 133, 558 S.E.2d at 107.

"During a closing argument to the jury an attorney may not . . . express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant. . . ." N.C.G.S. § 15A-1230(a). However, "prosecutors are allowed to argue that the State's witnesses are credible." *State v. Augustine*, 359 N.C. 709, 725, 616 S.E.2d 515, 528 (2005), *cert. denied*, 548 U.S. 925, 165 L. Ed. 2d 988 (2006). As to Mrs. Davis, the prosecutor did not personally vouch for her veracity but instead provided jurors reason to believe Mrs. Davis by arguing that her testimony was truthful because it was corroborated. Somewhat similarly, as to Kingrey, the prosecutor pointed out that her testimony was consistent with the evidence. In so doing, the prosecutor conceded weaknesses by acknowledging that Kingrey is not a likeable person and that some of Kingrey's statements, such as her statements about Ferguson's footwear, did not fit the State's theory of the case. While the prosecutor's passing comment that he believed Kingrey was telling the truth violated section 15A-1230(a), the comment was made while admitting weaknesses in her testimony.

Taken in context, we do not believe this argument about Kingrey was so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*.

As to the prosecutor's argument that defendant and Malanowski are equally culpable for the murders of Dinoff and VonCannon, we concluded above that the prosecutor correctly explained the legal theory of acting in concert. The prosecutor's statement that "[Malanowski]'s just as guilty as [defendant]" was part of this argument, pointing out that the law allows two people to be found guilty of one crime. Because the prosecutor's depiction of the law was accurate, the argument was proper. These assignments of error are overruled.

[14] Fifteenth, defendant argues that, should this Court conclude that no single error identified in the guilt phase of his trial was prejudicial, the cumulative effect of the errors nevertheless was sufficiently prejudicial to require a new trial. Cumulative errors lead to reversal when "taken as a whole" they "deprived [the] defendant of his due process right to a fair trial free from prejudicial error." *State v. Canady*, 355 N.C. 242, 254, 559 S.E.2d 762, 768 (2002). Although defendant has contended to this Court that numerous errors were made during trial, we have found error only in the admission of (1) hearsay in the form of Mr. Davis' cell phone number, (2) Sharpe's opinion testimony concerning VonCannon's reputation for peacefulness, and (3) Mrs. Davis' assumption that her husband sold drugs to defendant in their back bedroom. In addition, the prosecutor's personal vouching for Kingrey's veracity was improper. However, these errors, individually or collectively, do not fatally undermine the State's case. We have reviewed the record as a whole and, after comparing the overwhelming evidence of defendant's guilt with the evidence improperly admitted, we conclude that, taken together, these errors did not deprive defendant of his due process right to a fair trial. This assignment of error is overruled.

[15] In his sixteenth argument, defendant contends that the trial court erred by denying his motion to dismiss the charges of felony murder and first-degree burglary. Specifically, defendant contends that the State failed to present sufficient evidence that he possessed the felonious intent that is an essential element of first-degree burglary, *see State v. Maness*, 321 N.C. 454, 461, 364 S.E.2d 349, 352 (1988), when he broke and entered into Dinoff and Wyatt's residence. "When considering a motion to dismiss, the trial court must view the

**STATE v. WILKERSON**

[363 N.C. 382 (2009)]

evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Morgan,* 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004), *cert. denied,* 546 U.S. 830, 163 L. Ed. 2d 79 (2005). "If substantial evidence exists to support each essential element of the crime charged and that defendant was the perpetrator, it is proper for the trial court to deny the motion." *Id.* "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Miller,* 363 N.C. 96, 99, 678 S.E.2d 592, 594 (2009) (citations and internal quotation marks omitted). Supporting evidence may be "direct, circumstantial, or both." *State v. Locklear,* 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988). Moreover, "evidence of what a defendant does after he breaks and enters a house is evidence of his intent at the time of the breaking and entering." *State v. Gray,* 322 N.C. 457, 461, 368 S.E.2d 627, 629 (1988); *accord State v. Williams,* 330 N.C. 579, 585, 411 S.E.2d 814, 818 (1992).

Here, the State's evidence showed that defendant threatened to kill Dinoff over thirty dollars worth of cocaine that defendant believed Dinoff had stolen. In a 911 call made shortly after receiving the threats, Wyatt stated: "He told me that they'd be here in fifteen minutes" and "[t]hey told me that if—you know, if they did not get thirty bucks, that they were going to shoot anyone who came across them." In one of his 11 January 2005 statements to Detective Azelton, defendant acknowledged that he was inside the mobile home at the time of the murders and that he searched Dinoff's and VonCannon's pockets. Defendant added that Dinoff was shot when it became apparent that he did not have any money, though he named Malanowski as the shooter. Investigators found Dinoff's wallet next to his body on the couch and a twenty dollar bill on the gravel driveway outside the home. Although Detective Azelton did not mention the twenty dollar bill to defendant, during a statement to Detective Azelton made two days later, defendant volunteered that the money was not his, explaining that Malanowski probably dropped the bill when running from the home. From this substantial evidence the jurors could find that defendant broke and entered into Dinoff and Wyatt's residence with intent to commit felony larceny therein.

Defendant interprets other evidence introduced in this case to support his arguments either that the murders were committed solely for the purpose of preserving the perpetrators' reputations as drug dealers or that the perpetrators had abandoned their intent to rob Dinoff by the time they broke into the mobile home. However,

"[w]hen ruling on a motion to dismiss for insufficient evidence . . . . [a]ny contradictions or conflicts in the evidence are resolved in favor of the State and evidence unfavorable to the State is not considered." *Miller*, 363 N.C. at 98, 678 S.E.2d at 594 (citations omitted). Accordingly, these assignments of error are overruled.

**[16]** Seventeenth, defendant contends the trial court committed prejudicial error when it denied his motion to suppress his post-arrest statements to investigators. Defendant argues that these statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), because his statements "were involuntary" and because he was unable to waive his rights "knowingly, voluntarily, and intelligently." The gist of defendant's arguments is first, that he was intoxicated and thus unable to waive his rights consistent with *Miranda* and second, that the statements resulted from improper official coercion. Defendant claims that the admission of his statements at trial violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 18, 19, 23, 24, and 27 of the North Carolina Constitution.

Defendant filed a pretrial motion to suppress his statements, and the trial court conducted a *voir dire* hearing on the motion. After hearing evidence from Detective Azelton and Lieutenant Davis and considering the arguments of counsel, the trial court made extensive oral findings of fact. In those findings, the trial court determined that the evidence showed defendant was apprehended at approximately 1:00 a.m. on 11 January 2005, and Detective Azelton was assigned to interview him. Defendant appeared relieved when Detective Azelton entered the interrogation room, and although defendant refused to speak to Sheriff Hurley, he agreed to talk to Detective Azelton.

The trial court further found that Detective Azelton observed that defendant's pupils were dilated and his eyes were red and glassy. While defendant appeared to have been smoking marijuana, Detective Azelton had interviewed him on previous occasions, and she noted that his manner of speech was the same as during the prior interviews. Defendant acknowledged that he had smoked marijuana, used cocaine, and drunk alcohol some time before the incident under investigation. Nevertheless, defendant's answers to Detective Azelton's questions were responsive, articulate, cogent, logical, and clear, even though these responses were not always consistent with the evidence the investigators were finding. When defendant stated

that he was "high," he used this term in the past tense and only to explain why he might be unable to remember the events that occurred earlier in the evening. Defendant did not use the term to refer to his present ability to understand and answer the investigators' questions. The trial court found that no evidence in the record indicated that defendant stated that he was under the influence of an impairing substance while being questioned.

The trial court further found that once Sheriff Hurley left the room, Detective Azelton read defendant his *Miranda* rights as follows:

> Question: Do you understand each of these rights I have explained to you.
>
> The Defendant's response: Yes.
>
> [Question]: Two. Having read the rights in mind, do you wish to answer questions.
>
> [Answer]: Yes. Defendant's answer.
>
> [Question]: Three. Do you now wish to answer questions without a lawyer present?
>
> Defendant's answer: No, I don't need a lawyer. Yeah I'll talk to you.

The *Miranda* warning form was then executed by defendant.

Detective Azelton let defendant tell his story, then asked him to repeat the story, wrote down his statement, read the statement back to defendant to check its accuracy, and had defendant sign and date the statement. During the initial interview, defendant answered a call on his cell phone from his friend "Will." The first portion of the interview concluded at approximately 3:42 a.m.

Detective Azelton then left defendant in the interview room for approximately ten minutes. When she returned, she informed defendant that she did not believe he was being truthful and, without again administering *Miranda* warnings, asked defendant several more questions that defendant answered without objection. As before, Detective Azelton wrote out defendant's statements, read them back to him for clarity, and had him sign the statements.

Detective Azelton left the room for a second time for approximately twenty-three minutes, then returned with Lieutenant Davis

and Detective Julian. Lieutenant Davis, who did not re-advise defendant of his *Miranda* rights, interviewed defendant for approximately twenty minutes. Defendant did not object to the presence of the new detectives, and the final interview ended at approximately 7:12 a.m. In all, defendant was interviewed for approximately four hours.

Defendant also volunteered to assist Detective Azelton by drawing a map that marked areas where specific evidence could be found and then offered to lead investigators to the location of some of the evidence. Defendant was placed in the back of a patrol car and driven to the scene. While investigators were searching for the evidence at approximately 8:00 a.m. on 11 January 2005, defendant fell asleep in the patrol car.

As noted, defendant was not re-*Mirandized* after Detective Azelton initially read defendant his *Miranda* rights. However, there is no evidence in the record that defendant ever requested to terminate the interview, nor did defendant request counsel at any time during any of the interviews. Although defendant occasionally trailed off in the middle of his sentences, he did not exhibit any confusion or slur his words during the interviews. Based upon these findings of fact, the trial court concluded as a matter of law that defendant's statements were given voluntarily pursuant to a knowing, intelligent, and voluntary waiver of his *Miranda* rights and that the *Miranda* warnings initially given by Detective Azelton were sufficient to allow admission of all defendant's statements made the morning of 11 January 2005.

A trial court's findings of fact regarding the voluntary nature of an inculpatory statement are conclusive on appeal when supported by competent evidence. *State v. Parton*, 303 N.C. 55, 69, 277 S.E.2d 410, 420 (1981), *overruled in part on other grounds by State v. Freeman*, 314 N.C. 432, 437-38, 333 S.E.2d 743, 746-47 (1985). However, a trial court's determination of the voluntariness of a defendant's statements "is a question of law and is fully reviewable on appeal." *State v. Barden*, 356 N.C. 316, 339, 572 S.E.2d 108, 124 (2002) (citation and internal quotation marks omitted), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). Conclusions of law regarding the admissibility of such statements are reviewed de novo. *State v. Hyatt*, 355 N.C. 642, 653, 566 S.E.2d 61, 69 (2002), *cert. denied*, 537 U.S. 1133, 154 L. Ed. 2d 823 (2003).

To be valid, a waiver of *Miranda* rights must be (1) given voluntarily "in the sense that it was the product of a free and deliberate

choice rather than intimidation, coercion, or deception," and (2) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421 (1986). When determining the validity of a *Miranda* waiver, the reviewing court applies a totality-of-circumstances test. *Id.*

As to defendant's claim that he was under the influence of drugs when he made his statements, "intoxication is a circumstance critical to the issue of voluntariness." *State v. McKoy*, 323 N.C. 1, 22, 372 S.E.2d 12, 23 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). The trial court did not find defendant was intoxicated or under the influence of a controlled substance when he gave his statements, but even if he was, "[t]he fact that [the] defendant was intoxicated at the time of his confession does not preclude the conclusion that defendant's statements were freely and voluntarily given." *State v. Oxendine*, 303 N.C. 235, 243, 278 S.E.2d 200, 205 (1981), *superceded by statute*, N.C.G.S. § 8C-1, Rule 607 (1983), *on other grounds as recognized in State v. Covington*, 315 N.C. 352, 357, 338 S.E.2d 310, 314 (1986). "An inculpatory statement is admissible unless the defendant is so intoxicated that he is unconscious of the meaning of his words." *Id.*; *see also Parton*, 303 N.C. at 69-70, 277 S.E.2d at 420 (finding no error in trial court's denial of the defendant's motion to suppress his confession to murder given after receiving *Miranda* warnings when the trial court found the statements to be voluntary, even though the arresting officer believed the defendant to be intoxicated but the defendant was not staggering and was coherent). Here, the trial court's finding of fact was largely based on the interviewing detectives' testimony that defendant appeared to be impaired but was able to respond to questioning coherently and logically. This testimony, combined with other similar evidence, fully supports the trial court's finding of fact that defendant comprehended his rights at the time that he executed the waiver. Therefore, the trial court's findings of fact support the court's conclusion of law that defendant knowingly and voluntarily waived his rights under *Miranda*.

Defendant also argues that his statements were the result of improper police coercion. To be admissible, a defendant's statement must be "the product of an essentially free and unconstrained choice by its maker," *Culombe v. Connecticut*, 367 U.S. 568, 602, 6 L. Ed. 2d 1037, 1057 (1961), and the State must show by a preponderance of the evidence that defendant's confession was voluntary, *State v. Perdue*,

320 N.C. 51, 59, 357 S.E.2d 345, 350 (1987). A court "determine[s] whether a statement was voluntarily given based upon the totality of the circumstances." *State v. Walls*, 342 N.C. 1, 30, 463 S.E.2d 738, 752 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996).

In *Colorado v. Connelly*, the United States Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." 479 U.S. 157, 167, 93 L. Ed. 2d 473, 484 (1986). Coercive police activities on which the court should focus include: "extensive cross-questioning," "undue delay in arraignment," "failure to caution a prisoner," and "refusal to permit communication with friends and legal counsel at stages in the proceeding when the prisoner is still only a suspect," *Culombe*, 367 U.S. at 601, 6 L. Ed. 2d at 1057, as well as "the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward [the defendant,] his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance and self-control," *id.* at 602, 6 L. Ed. 2d at 1057. The voluntariness of a defendant's statements "is a question of law and is fully reviewable on appeal." *Barden*, 356 N.C. at 339, 572 S.E.2d at 124 (citation and internal quotation marks omitted).

Here, the evidence shows that the police employed a nonconfrontational interview method. From the time defendant was taken into custody until the questioning ended, defendant never objected to police questioning, never requested counsel, and was cooperative with detectives, even if not consistently truthful. The authorities initially permitted defendant outside contact with friends when defendant answered his cell phone during the course of the interviews and was allowed to converse with the caller. In short, there is no evidence of the type of coercive police activities required to render a confession involuntary. Accordingly, we conclude that defendant's post-arrest statements were not coerced.

For the reasons stated above, we determine that defendant validly waived his *Miranda* rights and that defendant's post-*Miranda* statements were voluntarily given. The trial court did not err in denying defendant's motion to suppress his post-arrest statements. These assignments of error are overruled.

[17] In his eighteenth argument, defendant contends that the trial court erred in denying his motion to suppress the results of the search of his cellular telephone. Defendant maintains that the trial

court erroneously ruled that defendant consented to the seizure of the phone and that the subsequent search of the phone while he was in police custody was improper.

Before trial, defendant filed a motion to suppress the evidence relating to the seizure of his cell phone. The court conducted an evidentiary hearing during which Detective Azleton testified that defendant received a call on the phone while in custody. When the detective asked defendant who the caller was, he answered that it was his friend "Will." Detective Azleton asked who else had called defendant that morning, and defendant scrolled through his cell phone's log, showing her the numbers of the telephones that had called his phone and the times the calls were made. Detective Azleton testified that she then told defendant, "George, we're going to need to take that. And he said okay and gave it to me." When questioned specifically whether defendant consented to her taking his cell telephone, Detective Azelton answered, "Yes." Defendant declined the court's offer to be heard as to the legality of the seizure. The trial court made oral findings

that the cell phone was seized subject to the arrest of the Defendant.

The Court further finds that the Defendant, after having received a telephone call while being interviewed by Detective Azelton, voluntarily surrendered the telephone to Detective Azelton at her request.

The Court therefore finds:

One—or concludes that One, the telephone was seized subject to a valid arrest of the Defendant and further, the Court concludes that the Defendant consented to the seizure of his phone by the Sheriff's Department.

It is therefore ordered that the Motion to Suppress Evidence as to the seized call [sic] phone is denied.

At trial, the cell phone was admitted into evidence over defendant's renewed objections. The State used the serial number, located inside the cell phone, to prove that this phone was used to make calls to Allred around the time of the murders.

When reviewing a motion to suppress evidence, this Court determines whether the trial court's findings of fact are supported by competent evidence and whether the findings of fact support the conclu-

sions of law. *State v. Haislip*, 362 N.C. 499, 499, 666 S.E.2d 757, 758 (2008) (per curiam). If supported ·by competent evidence, the trial court's findings of fact are conclusive on appeal, even if conflicting evidence was also introduced. *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (citations omitted). However, conclusions of law regarding admissibility are reviewed de novo. *Hyatt*, 355 N.C. at 653, 566 S.E.2d at 69.

The trial court correctly found that the seizure was pursuant to defendant's arrest.

> [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

*United States v. Edwards*, 415 U.S. 800, 807, 39 L. Ed. 2d 771, 778 (1974). "Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial." *Id.* at 803-04, 39 L. Ed. 2d at 776; *see, e.g., State v. Steen*, 352 N.C. 227, 240-41, 536 S.E.2d 1, 9-10 (2000) (the defendant's clothing was seized pursuant to a lawful arrest and could be searched six days later because the effects in the defendant's possession at the time he was lawfully in custody could be seized and searched without a warrant; any question of the defendant's consent to the search was irrelevant), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001). Similarly, in the case at bar, the seizure and the search of the telephone were properly accomplished pursuant to a lawful arrest. The trial court did not err in denying defendant's motion to suppress the evidence resulting from the search of defendant's cell phone. These assignments of·error are overruled.

## PRESERVATION ISSUES

Defendant raises three additional issues that he concedes have previously been decided by this Court contrary to his position. First, defendant argues that the trial court erred by permitting the prosecutor to comment about defendant's lack of remorse during closing argument of the capital sentencing proceeding. We have held that such comments are permissible as long as the prosecutor does not

STATE v. WILKERSON

[363 N.C. 382 (2009)]

argue that lack of remorse is an aggravating circumstance. *See, e.g., Augustine,* 359 N.C. at 734-35, 616 S.E.2d at 533. Here, the prosecutor expressly told jurors that lack of remorse is not an aggravating circumstance. Second, defendant argues that the trial court committed plain error by permitting each murder to be submitted as an aggravating circumstance of the other murder when it submitted the (e)(11) aggravating circumstance to the jury. *See* N.C.G.S. § 15A-2000(e)(11) (2007) ("The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons."). This Court has consistently held that when a defendant is convicted of two murders, each murder may be used to aggravate the other without violating the defendant's double jeopardy rights. *See, e.g., State v. Boyd,* 343 N.C. 699, 719-20, 473 S.E.2d 327, 338 (1996), *cert. denied,* 519 U.S. 1096, 136 L. Ed. 2d 722 (1997). Last, defendant argues that the trial court lacked jurisdiction to enter judgments of conviction against him because the short-form murder indictments failed to allege all elements of the offenses for which he was charged. This Court has repeatedly held that short-form murder indictments satisfy the requirements of our state and federal constitutions. *See, e.g., State v. Hunt,* 357 N.C. 257, 278, 582 S.E.2d 593, 607, *cert. denied,* 539 U.S. 985, 156 L. Ed. 2d 702 (2003). We have considered defendant's arguments on these issues and decline to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[18] As required by section 15A-2000(d)(2), we next consider whether the record supports the aggravating circumstances found by the jury, whether the death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2007).

Following defendant's capital sentencing proceeding, the trial court submitted two aggravating circumstances for the jury's consideration: (1) the murder was committed while defendant was engaged in the commission of first-degree burglary, pursuant to section 15A-2000(e)(5), and (2) the murder was part of a course of conduct in which defendant engaged and that included the commission by defendant of other crimes of violence against other persons, pur-

suant to section 15A-2000(e)(11). The jury found both of these aggravating circumstances to exist beyond a reasonable doubt. Our review of the record indicates that both circumstances are fully supported by the evidence presented at trial. Moreover, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

In conducting our proportionality review, we determine whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.* § 15A-2000(d)(2). We compare this case to those in which we have determined the death penalty was disproportionate. This Court has held the death penalty to be disproportionate in eight cases: *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any of these cases.

Here, defendant committed two murders. "This Court has never found a sentence of death disproportionate in a case where a defendant was convicted of murdering more than one victim." *State v. Meyer*, 353 N.C. 92, 120, 540 S.E.2d 1, 17 (2000), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 54 (2001). In addition, the murders occurred inside the home of one of the victims. We have previously observed that a murder in one's home is particularly shocking, "not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown*, 357 N.C. 382, 394, 584 S.E.2d 278, 285-86 (2003) (internal quotation marks omitted), *cert. denied*, 540 U.S. 1194, 158 L. Ed. 2d 106 (2004). Moreover, defendant was convicted of first-degree murder both under the felony murder rule and on the basis of malice, premeditation, and deliberation. "Although a death sentence may properly be imposed for convictions based solely on felony murder, a finding of premeditation and deliberation indicates a more calculated and cold-blooded crime for which the death penalty is more often appropriate." *State v. Taylor*, 362 N.C. 514, 563, 669 S.E.2d 239, 276

**STATE v. WILKERSON**

[363 N.C. 382 (2009)]

(2008) (citations and internal quotation marks omitted). We also consider the brutality of the murders. *State v. Duke*, 360 N.C. 110, 144, 623 S.E.2d 11, 33 (2005), *cert. denied*, 549 U.S. 855, 166 L. Ed. 2d 96 (2006). These murders involved the use of at least two semiautomatic assault rifles and a pistol against young, unarmed victims, resulting in multiple close range gunshot wounds to each victim's head or neck. Finally, this Court has determined that the section 15A-2000(e)(11) aggravating circumstance, standing alone, is sufficient to support a death sentence. *State v. Polke*, 361 N.C. 65, 77, 638 S.E.2d 189, 196 (2006), *cert. denied*, —— U.S. ——, 169 L. Ed. 2d 55 (2007).

This Court also compares the present case with cases in which we have found the death penalty to be proportionate. *State v. al-Bayyinah*, 359 N.C. 741, 762, 616 S.E.2d 500, 515 (2005), *cert. denied*, 547 U.S. 1076, 164 L. Ed. 2d 528 (2006). After carefully reviewing the record, we conclude that this case is more analogous to cases in which we have found the sentence of death proportionate than to the cases in which we have found it disproportionate or to the cases in which juries have consistently recommended sentences of life imprisonment. Although defense counsel presented evidence of several mitigating circumstances, including circumstances related to defendant's childhood and substance addiction, and although at least one or more jurors found several of these mitigating circumstances to exist, we are nonetheless convinced that the sentence of death here is not disproportionate.

Accordingly, we conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error, and the death sentence recommended by the jury and imposed by the trial court is not disproportionate.

NO ERROR.