An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-963

Filed 18 June 2025

Brunswick County, Nos. 21CRS051816-090, 21CRS051817-090, 21CRS051818-090 21CRS051819-090

STATE OF NORTH CAROLINA

      v.

JOSE LUIS ROMAN MARTINEZ, Defendant.

Appeal by defendant from judgments entered 31 October 2023 by Judge Joshua W. Willey Jr. in Brunswick County Superior Court. Heard in the Court of Appeals 22 May 2025.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Sarah Nicole Tackett, for the State.*
>
> *Christopher J. Heaney, for defendant-appellant.*

FLOOD, Judge.

Defendant Jose Luis Roman Martinez appeals from the trial court's judgments finding him guilty of three counts of sexual act by a substitute parent or custodian, four counts of taking indecent liberties with a child, and three counts of statutory sexual offense with a child by an adult. On appeal, Defendant argues the trial court

erred in preventing Defendant from questioning a key witness about a prior inconsistent statement, and such error was prejudicial to Defendant's case. Upon review, we conclude Defendant has failed to demonstrate the witness' prior statement was inconsistent, and as such, find no error on part of the trial court.

## I. **Factual and Procedural Background**

In early 2016, Carla Silva reconnected with and began to date Defendant, who, like Carla, is from Mexico, and is a childhood friend of hers. In April 2016, Carla and her two young daughters moved in with Defendant, and lived with him in his trailer in Southport, North Carolina. The elder daughter, Sarah,[1] was around nine years of age at the time she moved in with Defendant. During Carla and her daughters' shared residency with Defendant, Defendant would take care of Sarah and her sister while Carla was at work or running errands. In or around September 2016, Carla and her daughters moved with Defendant to a house in South Carolina, but stayed there for only one night before Carla got into an argument with Defendant, and they broke up. Carla and her daughters left Defendant's home, and Sarah neither saw nor spoke to Defendant again, prior to the trial underlying this appeal.

In late 2020 or early 2021, Sarah confided in her minor friend, Amy, that Defendant had touched her inappropriately during the time that she lived with him. While Sarah did not provide any details to Amy, Sarah made her promise not to tell

---

[1] Pseudonyms are used to protect the identities of all the minor children, pursuant to N.C.R. App. P. 42(b).

anyone of this disclosure, and Amy kept that promise. A few weeks after her disclosure to Amy, Sarah called another minor friend, Mallory, on FaceTime, and told Mallory what Defendant had done to her. To Mallory, Sarah detailed that Defendant "had given her oral sex" while Carla was not at home, and that while she felt guilty for not sooner disclosing the abuse, it was "holding so much weight on her that she felt like she needed to say something." After her conversation with Sarah, Mallory informed her own mother of Sarah's disclosure.

Soon after speaking with Mallory, Sarah came to and told Carla that Defendant had touched and fondled her while they lived together. On 5 February 2021, Carla dialed 9-1-1, and Sarah informed the police that her "mom's boyfriend did something to [her] a few years ago." Detective Jeffry Severino of the Brunswick County Sherriff's Office was assigned as lead detective of the case, and began his investigation by arranging for Sarah to be assessed by medical professionals at the Carousel Center in Wilmington, North Carolina—a child advocacy center that specializes in interviewing and assessing children who may have been victims of child abuse or neglect.

On 22 February 2021, when Sarah was fourteen, she went to the Carousel Center for a recorded forensic interview conducted by Julie Ozier, and a medical examination conducted by Mary Beth Koehler. Following the interview and examination, Detective Severino watched the recording of the forensic interview. Detective Severino thereafter interviewed Sarah, wherein Sarah described to

Detective Severino the three times Defendant had sexually assaulted her, and provided Detective Severino with hand-drawn diagrams depicting the layout of Defendant's house, to demonstrate where each of these three assaults had occurred.

During his investigation, Detective Severino interviewed several other individuals to corroborate Sarah's account, including: Defendant's previous landlord, who confirmed that Sarah and her family had been living with Defendant in his Southport residence from April to August 2016; Carla, who told him that, shortly after she started working at a hotel, Sarah stopped calling Defendant "dad"; and Mallory, who corroborated that Sarah told her Defendant had "masturbated her vagina" and "performed oral sex on her," that it happened while Carla was not home, and that Sarah would get away by going to a friend's house. Detective Severino also interviewed Defendant, who denied Sarah's allegations, and claimed that Carla was a jealous woman with a drinking problem, who treated Sarah "badly" and would put makeup on Sarah "like a grown woman[.]"

On 7 May 2021, Defendant was arrested, and on 7 June 2021, a grand jury issued a bill of indictment charging Defendant with: four counts of sexual act by a substitute parent/custodian, four counts of taking indecent liberties with a child, and four counts of statutory sexual offense with a child by an adult. On 25 October 2023, this matter came on for trial, and during evidence, the State presented witness testimonies from Sarah, Carla, Amy, Mallory, Mallory's mother, Detective Severino, Ozier, and Koehler.

Sarah testified as to the three incidents where Defendant sexually assaulted her. Regarding the first incident, Sarah testified that, while Carla was at work, Sarah and her sister had been watching television on the couch in the living room. Defendant was sitting on the floor, watching television with them, when he suddenly started "playing around" by tickling Sarah. Defendant then "started putting his hands under [her] shorts" and began touching Sarah's vagina with his fingers. Regarding the second incident, Sarah testified that Carla was not at home, and Defendant took Sarah into his bedroom, leaving her sister in the living room. Defendant again started tickling Sarah, who was lying on the bed; pulled her to the edge of the bed; took off her shorts and underwear; and began to lick and put his tongue inside of her vagina. Regarding the third incident, Sarah testified that Carla was again not at home, and Defendant brought her into his bedroom. As before, Defendant tickled Sarah as she was lying on his bed, and pulled down her shorts and underwear. Defendant then touched Sarah's vagina with his hand; inserted his fingers inside of her vagina, causing pain for Sarah; and put his mouth on her vagina. After this assault, Sarah left Defendant's house and went to a friend's house.

Following direct examination of Sarah, defense counsel requested an *in camera* hearing regarding a desired cross-examination of Sarah, and the trial court granted this request. Outside the presence of the jury, defense counsel expressed his desire to question Sarah about a prior, allegedly inconsistent statement made in a 2020 forensic interview regarding sexual contact by her friend's father, wherein the

interviewer asked her whether "anyone [has] done anything like this to you[,]" and

Sarah responded, "no." The State objected to defense counsel's proposed line of

questions, and defense counsel then conducted a *voire dire* examination of Sarah,

which resulted in the following colloquy:

> Q. [Sarah], when you were asked [during the 2020 forensic
> interview], "Has anyone done anything like this to you?"
> what did you understand that to mean?
>
> A. I understand [sic] what had happened to me in that
> current situation. If that had ever happened to me before.
> I said no, because - -
>
> Q. What do you mean by "that"?
>
> A. My friend's dad touching my boob.

The trial court thereafter sustained the State's objection, excluding introduction of

this testimony, and finding any probative value of defense counsel's proposed cross-

examination to be substantially outweighed by the risk of undue prejudice and

confusion of the issues.

Carla next testified, stating that she had noticed a change in Sarah and

Defendant's relationship in the early summer of 2016, when Sarah had started

distancing herself from Defendant, telling Carla that Defendant "was no longer her

dad[,]" and began "behaving like she was more distracted and just different."

Detective Severino testified as to his full investigation, and that, during his

interview with Sarah, she told him—regarding one of the incidents in the bedroom—

Defendant had pulled down her shorts and underwear, and inserted his fingers into

- 6 -

her vagina; Defendant then held her down with his legs and performed oral sex on her; and when Defendant was finished, Sarah left and went to a friend's house. Detective Severino also testified that Sarah had told him: regarding the other incident in Defendant's bedroom, Defendant had "inserted his fingers into her vagina"; and regarding the incident on the couch in the living room, Defendant "started tickling her in the armpits, and then started tickling her upper shorts, and ended up touching her vagina" with his hand.

Ozier testified as an expert witness, and stated that, during the recorded forensic interview—wherein Sarah described to Ozier the three incidents of alleged assault, and which was played for the jury—she had asked open-ended questions of Sarah. Ozier testified that, in her experience and based on research in her field, "[m]ost children do not tell [of] a sexual abuse immediately[,]" and "delayed disclosures are the norm." Ozier explained that such a victim may delay disclosure anywhere from a couple weeks until even adulthood, and when the victim finally does disclose, it is often to a peer before a parent or caregiver.

Koehler also testified as an expert witness, and provided that, during the medical examination, Sarah had disclosed that Defendant "had hurt her[,]" he "would touch her vaginal area with his fingers[,]" and "his mouth touched . . . her vaginal area." Koehler also testified that the results of Sarah's anogenital exam were "normal" and there were no signs of injury, but that this is consistent with what she observes in 95% of child sexual abuse cases, and that in cases of delayed disclosure

involving digital penetration of and oral contact with the vagina, it is expected that there would be no injuries, because the vaginal tissue "heals very quickly."

At the close of the State's evidence, Defendant moved to dismiss all charges, which the trial court denied. Defendant put on no evidence, and at the close of all evidence, renewed his motion to dismiss. The trial court granted Defendant's motion as to one count of statutory sex offense with a child by an adult, and one count of sexual act by a substitute parent/custodian, but denied the motion as to the remaining ten charges.

On 31 October 2023, the jury found Defendant guilty of the remaining ten charges, and that same day, the trial court sentenced Defendant as a prior Level I to a consolidated term of 300 to 420 months' imprisonment. The trial court also ordered Defendant have no contact with the victim, and to register as a sex offender for a period of thirty years upon release from prison. Defendant timely appealed.

## II. <u>Jurisdiction</u>

This Court has jurisdiction to review this appeal from a final judgment of a superior court, pursuant to N.C.G.S. § 7A-27(b)(1) (2023).

## III. <u>Analysis</u>

Defendant argues on appeal that the trial court erred in preventing Defendant from questioning Sarah about a prior inconsistent statement made during the 2020 forensic interview, and that such error was prejudicial to Defendant's case. We disagree.

This Court reviews for abuse of discretion a trial court's decision to exclude evidence by limiting the scope of cross-examination, which requires "a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. West*, 255 N.C. App. 162, 165 (2017) (citation omitted); *see also State v. Edmonds*, 212 N.C. App. 575, 579 (2011) (providing that, upon review of a trial court's decision to limit the scope of cross-examination, this Court defers to "the sound discretion of the trial court, and its ruling thereon will not be disturbed absent a showing of abuse of discretion" (citation omitted)). "Even where this Court finds the trial court's evidentiary decision was in error, however, evidentiary error does not necessitate a new trial unless the erroneous admission was prejudicial." *State v. Teel*, 909 S.E.2d 541, 549 (N.C. Ct. App. 2024) (citation and internal quotation marks omitted). "A defendant is prejudiced by evidentiary error when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached" by the jury. *State v. Wilkerson*, 363 N.C. 382, 415 (2009) (citation and internal quotation marks omitted).

Under Rule 412 of the North Carolina Rules of Evidence—commonly known as the "Rape Shield Statute"—evidence regarding the victim's past sexual activity is "irrelevant to any issue in the prosecution" unless it falls under any of four delineated exceptions. N.C.R. Evid. 412(b). As our Supreme Court has provided, however, the Rape Shield Statute "is nothing more [] than a codification of this jurisdiction's rule of relevance as that rule specifically applies to the past sexual behavior of victims[,]"

and as such, does not "exclude evidence generally considered relevant in trials of other crimes." *State v. Fortney*, 301 N.C. 31, 37, 42 (1980). Such relevant evidence includes a victim's prior inconsistent statements, that may be introduced to impeach her credibility as a witness. *See West*, 255 N.C. App. at 166.

Regarding proper introduction of such evidence, this Court has provided that "[e]vidence of prior sexual conduct is relevant when it affects an issue that is common to all trials, *e.g.*, a witness'[] inconsistent statement about . . . her sexual history." *Id.* at 166 (citation omitted). "The question of whether a prior statement is an inconsistent statement is a matter to be determined by the trial court after hearing evidence either party may offer, outside the presence of the jury." *State v. Ginyard*, 122 N.C. App. 25, 34 (1996); *see also State v. Morrison*, 84 N.C. App. 41, 46 (1987) (concluding the trial court properly excluded a prior, allegedly inconsistent statement where the defendant "failed to show that the testimony of the . . . witness[] was inconsistent").

Here, when considering whether to admit Sarah's cross-examination-elicited testimony regarding statements made during the 2020 forensic interview, the trial court properly conducted an *in camera* hearing on the matter. *See Ginyard*, 122 N.C. App. at 34. The trial court heard arguments from counsel, and defense counsel conducted a *voire dire* examination of Sarah, asking her what she had understood the 2020 forensic interviewer's question of whether "anyone [has] done anything like this to [her]"—to which she had answered, "no"—to mean. Sarah responded to defense

- 10 -

counsel's inquiry, stating that she had understood the interviewer's question to concern her "friend's dad touching [her] boob."

Defendant contends that Sarah's answer to the 2020 forensic interviewer's question was a prior inconsistent statement of Sarah's sexual history that, if considered by the jury, would have yielded a reasonable possibility of a different outcome of Defendant's trial. *See Wilkerson*, 363 N.C. at 415. We are unpersuaded by Defendant's contention. As set forth above, Sarah clarified during her *voire dire* testimony that she had understood the 2020 forensic interviewer's question to concern an adult male touching her breast. It cannot be said that Sarah's answer of "no" to the interviewer's question amounts to a statement inconsistent with her allegations of abuse by Defendant, as a review of the Record reveals no evidence—or accusation thereof—that Defendant touched or otherwise violated Sarah's breast. Rather, in her testimony before the jury, Sarah detailed three separate incidents where Defendant targeted and violated her vaginal area, and her testimonial accounts of these incidents were fully consistent with, and corroborated by, Detective Severino's and Ozier's testimonies, as well as the recorded 2021 forensic interview played for the jury.

Defendant has failed to demonstrate that Sarah's answer to the 2020 forensic interviewer's question constitutes a prior inconsistent statement regarding her sexual history, and as such, her statement could not be properly used to impeach Sarah's credibility as a witness. *See West*, 255 N.C. App. at 166. Accordingly, we

conclude the trial court did not abuse its discretion in excluding introduction of this evidence, and therefore find no error. *See id.* at 165; *see also Morrison*, 84 N.C. App. at 46; N.C.R. Evid. 412(b).

## IV. **Conclusion**

Upon review, we conclude Defendant has failed to demonstrate a key witness' prior statement made during the 2020 forensic interview was inconsistent with her allegations of abuse by Defendant. The trial court did therefore not abuse its discretion in excluding the introduction of the key witness' prior statement, and we find no error.

NO ERROR.

Judges STADING and MURRY concur.

Report per Rule 30(e).