An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-750

Filed 18 February 2026

Mecklenburg County, No. 20CR213169-590

STATE OF NORTH CAROLINA

v.

LAREE BRIDDELL, Defendant.

Appeal by defendant from judgment entered 10 December 2024 by Judge David Strickland in Mecklenburg County Superior Court. Heard in the Court of Appeals 29 January 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Cannon E. Lane, for the State.*
>
> *Drew Nelson, for defendant-appellant.*

FLOOD, Judge.

Defendant Laree Briddell appeals from her convictions following a jury trial for one count of intentional child abuse causing serious physical injury and one count of assault with a deadly weapon inflicting serious injury. On appeal, Defendant argues the trial court erred by admitting hearsay statements under Rule 803(4) of the North Carolina Rules of Evidence. After careful review, we hold the trial court

erred in admitting the hearsay statements; however, Defendant has failed to show that this error was prejudicial.

## I. **Factual and Procedural Background**

Following an altercation between Defendant and her son, Kamren Walker, Defendant was charged with one count of intentional child abuse causing serious physical injury and one count of assault with a deadly weapon inflicting serious injury. Evidence at Defendant's trial tended to show that, on 15 April 2020, Defendant, Defendant's daughter, and Kamren, who was thirteen years old at the time, went to their Aunt April Briddell's house to help clean up her yard after a storm. April's children, Kamren's cousins, were present as well. At some point during the cleanup, an argument broke out between Kamren, his sister, and his cousins after a tree branch fell on one of the cousins.

Though there are conflicting accounts of precisely what followed, April testified at trial that, as the argument between the children escalated, she and Defendant followed Kamren into the front yard. Kamren appeared "real agitated" about the situation, and he became more upset when Defendant appeared to be "getting on him[,]" but not his sister, for his role in the argument. Defendant then began raising her voice at Kamren, "saying things to him that she shouldn't be saying, calling him names." After seeing how agitated Kamren was, April tried to calm him down by giving him her cellphone and telling "him [to] walk up the street to the stop sign[.]"

April testified that, as Kamren was walking up the street, she saw Defendant go into the house and return with April's car keys and a pair of kitchen scissors. April then watched Defendant get into April's car and drive up the street towards Kamren. Once Defendant reached Kamren at the end of the street, April, who was still in the front yard, "couldn't see exactly what [Defendant] was doing but [saw Defendant and Kamren] going back and forth." April could see Defendant "asking for the phone -- the phone that she gave him. I guess that was [Kamren's] cellphone. And he threw it to her. And that's when it happened." April could not tell "if [Defendant] swung first but [saw Kamren] swing." April then saw Defendant "do something to [Kamren] but [] couldn't tell exactly what happened." April could not see whether anything was in Defendant's hand at the time of the altercation. April then saw Kamren's "face cut open," and walked up the street to examine his injuries. Upon seeing the gash on Kamren's face, April called 911.

When police arrived at the scene, they observed a blood trail and found scissors located on the floorboard of April's car parked by the stop sign. After investigating the incident, an officer placed Defendant under arrest and transported her to the Mecklenburg County Jail. Kamren was transported to the hospital by ambulance. At the hospital, Kamren was treated by emergency room physician Dr. Jessica Salzman.

While examining Kamren, Dr. Salzman noted a "large laceration" to Kamren's face. At trial, Dr. Salzman testified that, when she had asked Kamren what happened, Kamren stated "that he had been arguing with his sister and that his mom

attacked him with scissors." Defendant objected to this testimony, but the trial court overruled her, reasoning the testimony was admissible pursuant to Rule 803(4) of the North Carolina Rules of Evidence. Dr. Salzman created an emergency room report (the "ER Report") after examining Kamren, and this report was also admitted into evidence over Defendant's objection. The ER Report listed Kamren's "Chief Complaint" as "Pt[1] with very larg [sic] and deep laceration to right cheek, did not go through. Pt with multiple stab wounds and scratch marks to torso and back area."

The ER Report's "History of Present Illness" section documented that Kamren,

> presents for laceration to cheek *after assaulted with by mother with scissors.* History is obtained from the patient and EMS. EMS report that *the patient was assaulted by his mother with scissors*, wound was oozing small amounts of blood since then, never any pulsatile bleeding. Denies any injury anywhere else. According to the patient, he was in a verbal disagreement with his sister earlier. *His mom was apparently very angry about this and attacked him with scissors*. He complains only of pain in his right cheek. He denies pain anywhere else. Reports he did not hit his head, was not struck in the head or fell, did not lose consciousness. No neck pain, numbness or weakness or paresthesia[].

(emphasis added). Dr. Salzman explained she decided to consult with the plastic surgery team regarding Kamren's injury, as the course of treatment.

---

[1] In the context of the ER Report for Kamren, which references the "patient" multiple times, we assess "Pt" to mean "patient." *See State v. Scott*, 921 S.E.2d 209, 212 n.4 (N.C. Ct. App. 2025) ("Pt means patient[.]").

Kamren, who was eighteen at the time of the trial, testified on behalf of Defendant. Kamren testified that he, his sister, and his cousins were in April's backyard when an argument broke out. He explained that he became upset, and April and Defendant attempted to calm him down, but he "wasn't listening" and "was just yelling and going on." Kamren then turned his Air Pods "all the way up"; when Defendant reached for the Air Pods, he punched her. Kamren then walked away from the house towards the end of the street. By Kamren's account, Defendant approached him, and he hit Defendant again. Kamren could not recount precisely how his injuries occurred, but when defense counsel asked him, "in your opinion, did your mother purposely stab you in the face on April 15, 2020?" Kamren replied, "No, I don't think it was for a malicious intent. I don't think she meant to do it." Kamren explained that he only realized his face was cut when he touched his face and saw blood.

At the close of trial, the jury found Defendant guilty of one count of felony child abuse and one count of assault with a deadly weapon inflicting serious injury. Following the guilty verdicts, on 10 December 2024, the trial court sentenced Defendant to 44 to 65 months of imprisonment. Defendant gave oral notice of appeal in open court.

## II. **Jurisdiction**

This Court has jurisdiction to hear Defendant's appeal pursuant to N.C.G.S. §§ 7A-27 and 15A-1444 (2023).

## III. **Standard of Review**

"This Court reviews a trial court's ruling on the admission of evidence over a party's hearsay objection *de novo*." *State v. Joyner*, 284 N.C. App. 681, 690 (2022) (citations omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33 (2008) (citation and quotation marks omitted).

An "evidentiary error does not necessitate a new trial unless the erroneous admission was prejudicial." *State v. Wilkerson*, 363 N.C. 382, 415 (2009). "A defendant is prejudiced by evidentiary error when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]" *Id.* (citing N.C.G.S. § 15A-1443(a) (2007)). "The burden of showing . . . prejudice under [N.C.G.S. § 15A-1443(a)] is upon the defendant." *Id.* (citing *State v. Alston*, 307 N.C. 321, 339–40 (1983)).

## IV. Analysis

On appeal, Defendant argues the trial court erred in admitting Dr. Salzman's testimony regarding Kamren's identification of Defendant as his attacker, as well as the ER Report, which includes Kamren's identification of the person who caused his injury. Specifically, Defendant argues that these statements constituted inadmissible hearsay not subject to an exception, and requests this Court vacate her conviction. For the reasons stated below, although we agree the testimony and ER report constituted inadmissible hearsay not subject to an exception, Defendant has not shown that, but for the admission, a different result would likely have been reached

by the jury.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (2023). "Generally, hearsay is inadmissible at trial unless an exception to Rule 801(c) applies." *Joyner*, 284 N.C. App. at 690 (citation omitted).

One such exception to the hearsay bar is "Statements for Purposes of Medical Diagnosis or Treatment," found in Rule 803(4) of the North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 803(4) (2023). Rule 803(4) allows for the admission of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." *Id.* This exception "is based on the rationale that statements made for purposes of medical diagnosis or treatment are inherently trustworthy and reliable because of the patient's strong motivation to be truthful." *State v. Hinnant*, 351 N.C. 277, 284 (2000).

To ensure the reliability of such statements, our Supreme Court has established a two-part test as a prerequisite for admissibility under Rule 803(4):

> First, the trial court must determine that the declarant intended to make the statements at issue in order to obtain medical diagnosis or treatment. The trial court may consider all objective circumstances of record in determining whether the declarant possessed the requisite

intent. Second, the trial court must determine that the declarant's statements were reasonably pertinent to medical diagnosis or treatment.

*Id.* at 289. In other words, if a statement is not pertinent to the declarant's medical diagnosis or treatment, it no longer falls under the exception and reverts to being inadmissible hearsay.

Our Supreme Court has held that, "[g]enerally, under Rule 803(4), . . . statements as to an assailant's identity are seldom pertinent to diagnosis and do not ordinarily promote effective treatment"; thus, "such statements are[, ordinarily,] not properly covered by the Rule 803(4) exception to the hearsay rule." *State v. Aguallo*, 318 N.C. 590, 596–97 (1986). "If a declarant identifies the perpetrator while under the impression that he is being asked to indicate the responsible party, the identification may be accusatory in nature and thus would destroy any inherent reliability." *State v. Smith*, 315 N.C. 76, 85 (1985) (citing *United States v. Narciso*, 446 F. Supp. 252, 289 (E.D. Mich. 1977)). "If, however, the motivation for such statement was to disclose information to aid in medical diagnosis or treatment, the trustworthiness remains intact." *Id.*

Although North Carolina courts have not directly addressed whether the statements of a child abuse victim to a physician identifying his or her assailant are reasonably pertinent to medical diagnosis or treatment, our Supreme Court has held that, "in the context of a child *sexual* abuse or child rape, a victim's statements to a physician as to an assailant's identity *are* pertinent to diagnosis and treatment."

*Aguallo*, 318 N.C. at 597 (emphasis added) (citing *United States v. Renville*, 779 F. 2d 430 (8th Cir. 1985)). This is because (1) "a proper diagnosis of a child's psychological problems resulting from sexual abuse or rape will often depend on the identity of the abuser," and (2) "information that a child sexual abuser is a member of the patient's household is reasonably pertinent to a course of treatment that includes removing the child from the home." *Id.* at 597.

Here, Defendant does not dispute that Kamren's statement was made for the purpose of obtaining medical treatment; thus, the first prong of the *Hinnant* test is satisfied. Defendant argues, however, that Kamren's statement to Dr. Salzman identifying Defendant as the source of his injury was not reasonably pertinent to medical diagnosis, thereby failing the second prong of the *Hinnant* test.

To support her proposition, Defendant distinguishes *Aguallo* from the present case. In *Aguallo*, the child victim "was brought in . . . as an alleged sexual abuse case." 318 N.C. at 593. Due to the nature of the allegations, the treating physician explained that it was "part of [her] set routine" to speak with alleged child victims prior to her examination. *Id.* at 594. The physician testified that, during her conversation with the child, the child indicated that her stepfather had "put his hot dog up inside of her[.]" *Id.* The *Aguallo* defendant argued that the child victim's statements were "hearsay and not otherwise admissible under the [] Rule 803(4)[] exception applicable to statements made for the purpose of medical diagnosis or treatment." *Id.* at 593. The *Aguallo* Court disagreed and held that the child victim's statements identifying

her stepfather as the one who raped her were pertinent to her medical treatment because the nature of the problem suggested a need for "continued treatment of the possible psychological and emotional problems resulting from the rape." *Id.* at 597.

Here, Defendant argues the *Aguallo* exception does not apply in this case because "nothing in the record demonstrates that there was a psychological aspect to Kamren's treatment," and because "removal of Kamren from the household was not part of his treatment." We agree with Defendant that *Aguallo* is distinguishable from the present case. Unlike the child victim in *Aguallo*, Kamren was taken to the hospital as a potential assault victim, not a potential sexual abuse victim. Moreover, Kamren's statement did not indicate that he suffered, or would suffer, from psychological or emotional problems as a result of the attack. Rather, Kamren's statement indicated that the cause of his injury was an attack by scissors. Dr. Salzman testified that she decided to consult with the plastic surgery team for Kamren's course of treatment because, "[t]he deep laceration that we saw, we felt like there was enough of a concern for injuries, again, to the parotid gland or possible nerve injuries that this was something we wanted to get our plastic surgery team involved." Thus, as her own testimony indicates, Dr. Salzman's diagnosis was based on Kamren's statement that he was attacked with scissors, as well as "[t]he deep laceration [Dr. Salzman] saw," but not on Kamren's statement identifying Defendant as his assailant.

Further, Dr. Salzman's ER Report listed Kamren's possible diagnoses as

"[c]heek laceration, parotid gland herniation, parotid duct laceration, marginal mandibular nerve laceration, head trauma." Dr. Salzman explained at trial that these initial diagnoses were based on a preliminary examination of the patient and were used to assist in determining further treatment options. Dr. Salzman explained that it was these observations that led her to consult the plastic surgery department for potential surgical intervention. Because Dr. Salzman made the decision to consult plastic surgery based on the physical nature of Kamren's injuries, it follows that the course of treatment would have been the same, regardless of whether Kamren identified Defendant as the source of his injury. Consequently, Kamren's identification of Defendant as his attacker was not pertinent to his medical diagnosis or treatment. *See Hinnant*, 351 N.C. at 286 ("The veracity of the declarant's statements to the physician is less certain where the statements *need not have been made* for purposes of promoting treatment or facilitating diagnosis in preparation for treatment." (emphasis added) (citation omitted)).

Ultimately, Kamren's identification of Defendant as the person who caused the laceration on his face does not describe his "medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." *See* N.C.G.S. § 8C-1, Rule 803(4). As such, we agree with Defendant that the portion of Kamren's statement identifying Defendant as his assailant was not pertinent to medical diagnosis or treatment, thereby failing the second prong of the *Hinnant* test.

The trial court, therefore, erred in admitting Kamren's statement under Rule 803(4).

Although we conclude the trial court erred in admitting Kamren's statement, a new trial is not required because Defendant has failed to show that she was prejudiced by this error.

Here, assuming Kamren's statement to Dr. Salzman identifying Defendant as his assailant had not been admitted into evidence, Kamren identified Defendant as his assailant when he testified at trial that he "[didn]'t think [Defendant] meant to do it." Without Kamren's statement to Dr. Salzman, therefore, Defendant's identity as the attacker would nevertheless have been revealed by Kamren's own testimony. Consequently, Defendant has failed to show there is a reasonable probability that a different result would have been reached but for the erroneous admission of Kamren's statement. *See Wilkerson*, 363 N.C. at 415.

## V. Conclusion

After careful review, we hold that, although the trial court erred in admitting Kamren's statement to Dr. Salzman under Rule 803(4) of the North Carolina Rules of Evidence, Defendant has not shown that a different result likely would have been reached but for this error. Accordingly, we affirm Defendant's convictions and deny her request to vacate and remand to the trial court.

NO PREJUDICIAL ERROR.

Judges COLLINS and MURRY concur.

Report per Rule 30(e).